Bush Terminal Company and Others, Plaintiffs, *v.* The City of New York and Others, Defendants.

Supreme Court, New York County, June 20, 1934.

*Harper A. Holt* and *Abraham Lillienthal,* for the plaintiffs.

*Julius Henry Cohen* [*Mark Eisner, Austin J. Tobin, Burton A. Zorn* and *William A. Pallme* of counsel], for the defendant The Port of New York Authority.

*John J. Bennett, Jr., Attorney-General* [*Henry Epstein, Solicitor-General,* of counsel], for the State of New York.

*Kenneth M. Spence,* for the defendants The City of New York and the individual members constituting the board of estimate and apportionment.

*Charles H. Tuttle* of counsel, for Brooklyn Chamber of Commerce and others, appearing as *amicus curiæ.*

*Maurice J. Moore* and *John Francis Moore,* for the Brooklyn Real Estate Board, as *amici curiæ.*

*Harry B. Chambers,* for the New York Board of Trade, Inc.

*Charles W. Froessel,* for the Queensboro Chamber of Commerce.

*Almet R. Latson, Jr.,* counsel to New York State Economic Council, Inc., appearing as *amicus curiæ.*

*Campbell & Boland,* for the Hotel Association of New York City and another.

*William W. Hoppin,* for The First Avenue Association, Inc., and another, as *amicus curiæ.*

FRANKENTHALER, J. This is an action to restrain the city of New York and the board of estimate and apportionment from entering into an agreement with the Port of New York Authority by the terms of which (a) the Port Authority is to pay annually to the city of New York, as long as it shall own and manage the premises known as Inland Terminal No. 1, the sum of $60,064.10, and (b) said premises are to be stricken from the city's tax records and to be exempt from taxation by the city. The figure of $60,064.10 represents the amount of the taxes paid upon the property now occupied by Inland Terminal No. 1 immediately prior to its acquisition by the Port Authority.

The making of the proposed agreement is expressly authorized by chapter 553 of the Laws of 1931, enacted by the Legislature of the State of New York, and by chapter 69 of the Laws of 1931, adopted by the Legislature of the State of New Jersey. Each of these statutes is identical in content. Section 1 of each contains the following provision: " To the end that  *  *  *  municipalities in the port of New York district, may not suffer undue loss of taxes and assessments by reason of the acquisition and ownership of property therein by the Port of New York Authority  *  *  *,  the Port Authority is hereby authorized and empowered, in its discretion, to enter into a voluntary agreement or agreements with any  *  *  *  municipality in said port district, whereby it will undertake to pay a fair and reasonable sum or sums annually in connection with any marine or inland terminal property owned by it, not in excess of the sum last paid as taxes upon such property prior to the time of its acquisition by the Port Authority."

The complaint contains two causes of action. The first is a taxpayers' cause of action under the General Municipal Law, predicated upon the theory that the proposed agreement, if executed, would unlawfully deprive the city of the difference between the $400,000 or more, which it is claimed would be payable to the city as taxes but for the agreement, and the $60,064.10 specified therein. The second cause of action is prosecuted by the plaintiffs, as owners of buildings alleged to be in competition with Inland Terminal No. 1, on the theory that " any exemption or partial exemption granted to the Port Authority in connection with the said building will enable it to unfairly compete with these plaintiffs in renting

manufacturing, storage and office space, will place an undue burden upon these plaintiffs, will be unfair, unjust and discriminatory in favor of the Port Authority and against these plaintiffs and will deprive all these plaintiffs of their property without due process of law in violation of the Constitution of the State of New York and of the United States of America."

It must be readily apparent that the real question presented for consideration is whether Inland Terminal No. 1 would be exempt from local taxation even if the proposed agreement were not consummated. The defendants contend that in no event could the city lawfully levy taxes upon the terminal and that the statutes previously referred to clearly recognize the status of the terminal as tax-exempt property. If the defendants are correct in the position they have taken it is obvious that the plaintiffs' attempt to enjoin the execution of an agreement which will confer upon the city an annual gratuity of $60,064.10 must fail. On the other hand, if the terminal is not tax-exempt property the plaintiffs are manifestly entitled to an injunction against the consummation of an agreement whereby the city would relieve the terminal of annual taxes amounting to several hundred thousand dollars each year.

A brief history of the Port Authority and of its activities is essential to a proper understanding and consideration of the issues presented for determination. In the year 1917 the Legislatures of New York and New Jersey adopted statutes authorizing the Governors of those States to appoint members of the New York, New Jersey Port and Harbor Development Commission for the purpose of making recommendations " to the end that the said port [the Port of New York] shall be efficiently and constructively organized and furnished with modern piers  *  *  *  rail and water and freight facilities." (Laws of 1917, chap. 426.) The problem of the proper development of the Port of New York which confronted the Commission is very aptly described in the joint report of the Commission to the Governors of both States: " A serious situation confronts the Port of New York. The Port has drawn to itself a tremendous volume of business — nearly half of the foreign commerce of the country; more industrial establishments than are found in any other three metropolitan districts in the United States; more than twice as many inhabitants as reside in any one of those three. Continuous streams in and out of goods of all kinds are required to carry on the business of the Port and to sustain the life and health of its inhabitants. So large have become these streams, so little reservoir space is available in certain parts of the Port, that extraordinary mechanisms are required to

make them flow with the necessary volume and smoothness. These mechanisms are the terminal facilities of the district — railroad lines, railroad stations, piers, ferries, tugboats, lighters, motor trucks, warehouses, markets and other facilities. The Port has indeed gone to unmatched lengths in providing many of these facilities. But it has not kept pace with the demands and there has never been any general comprehensive plan for terminal developments of the Port considered as a whole to which all parties interested have subscribed or toward the realization of which all, municipal and private, have cooperated. In consequence, the flow of goods has become more and more irregular, terminal costs have mounted and the burden of congestion and expense presents a situation needing immediate correction." (New York, New Jersey Port and Harbor Development Commission, Joint Report 1920, p. 1.)

The Commission very appropriately characterized the situation as " a great sociological problem of chief concern to the public at large." It pointed out that " a heavy burden is thrown upon the commerce of the Port and adds to the cost of living. The public feels the oppressiveness of this burden but is unable to analyze its causes, which, however, can and should be removed. * * * Housing is an acute problem, and the inadequacy of terminal facilities for handling building materials discourages new construction. * * * Hardly a commodity for sale but bears some burden of high terminal costs. * * * New York is furthermore the financial center of the continent. It is the distributing point for foodstuffs for a large area and its prices have a large effect on prices throughout the country." (Id. pp. 2, 5.)

The transportation problem at New York is peculiarly complicated by the fact that the business center of the city is on the narrow and congested island of Manhattan, while almost all the railroad terminals are located on the New Jersey side of the harbor and of the Hudson river. The necessity of using car floats and lighters between the New Jersey terminals and the stations and piers on the New York side was the cause of very serious congestion of vehicles on the streets leading to the stations and piers where incoming freight was unloaded and outgoing freight assembled. The consequent cost of picking up and delivering freight assumed such proportions that it was found that the cost of handling freight through New York terminals was equivalent to the line-haul cost from New York to Buffalo. Constant complaints and agitation against the high cost of handling freight at New York resulted and it became a matter of imperative economic necessity to take drastic measures for the purpose of remedying the intolerable situation which existed.

The Commission realized that the active co-operation of both New York and New Jersey was essential to any solution of the transportation problem which confronted it and that whatever physical plans were finally worked out would require the bringing together of the two States in a treaty or compact " by which the States should co-operate through a common agency in the development of port facilities " (Progress Report for 1919 — New York Leg. Doc. 103). After two years of public discussion and debate the Legislatures of the respective States authorized the making of a compact between them (Laws of 1921, chap. 154, N. Y., and Laws of 1921, chap. 151, N. J.), and on April 30, 1921, a compact was signed by duly authorized Commissioners. The compact was consented to and ratified on August 23, 1921, by the Congress of the United States (42 Stat. at Large, chap. 277; Pub. Res. No. 17, 67th Cong.; S. J. Res. 88) and approved on the same day by the President of the United States.

The recitals of the compact refer to the treaty of 1834 between New York and New Jersey, fixing and determining the rights and obligations of the two States in and about the Bay of New York and the Hudson river, and to the development and increase of the commerce at the port of New York, with a resultant need for " better co-ordination of the terminal, transportation and other facilities of commerce." It recited that " the future development of such terminal, transportation and other facilities of commerce will require the expenditure of large sums of money and the cordial co-operation of the States of New York and New Jersey in the encouragement of the investment of capital, and in the formulation and execution of the necessary physical plans," a result best accomplished " through the co-operation of the two States by and through a joint or common agency." The compact accordingly supplemented and amended the treaty of 1834 in various respects. Both States pledged their faithful co-operation in the future planning and development of the port and to that end created a district to be known as the " Port of New York District," with definitely stated boundaries. They also created " The Port of New York Authority * * * which shall be a body corporate and politic, having the powers and jurisdiction hereinafter enumerated, and such other and additional powers as shall be conferred upon it by the legislature of either state concurred in by the legislature of the other, or by act or acts or Congress, as hereafter provided." (Art. III.) The Port Authority was granted " full power and authority to purchase, construct, lease and/or operate any terminal or transportation facility within said district; and to make charges for the use thereof; and for any of such purposes to own, hold,

lease, and/or operate real or personal property, to borrow money and secure the same by bonds or by mortgages upon any property held or to be held by it." (Art. VI.) Article X of the compact provided that " the Legislatures of the two states, prior to the signing of this agreement, or thereafter as soon as may be practicable, will adopt a plan or plans for the comprehensive development of the Port of New York." Until the adoption of such a plan the Port Authority was not to exercise any of the powers granted to it in article VI.

In the following year, 1922, the two States adopted a comprehensive plan for the development of the Port of New York (Laws of 1922, chap. 43, N. Y.; Laws of 1922, chap. 9, N. J.), " binding upon both states with the same force and effect as if incorporated " in the compact. (Compact, art. XI.) It was ratified by Congress on July 1, 1922 (42 Stat. at Large, chap. 277; Pub. Res. No. 66, 67th Cong.; H. J. Res. 337.) The statutes adopting the comprehensive plan state the principles to govern the development of the port, viz., the unification of terminal operations within the port district, so far as economically practicable; the consolidation of shipments at proper points; the direct routing of freight to avoid congestion; the establishment of terminal stations which " should be union stations so far as practicable; " the co-ordination of existing facilities; adequate tunnel and bridge connections between the several parts of the port district, etc. It was also provided that in order to obtain prompt relief definite measures of a temporary nature be devised and taken while more comprehensive plans were being carried out. Section 4 specifically required that " suitable markets, union inland terminal stations and warehouses be laid out at points most convenient to the homes and industries upon the island." Section 8 directs the Port Authority " to proceed with the development of the port of New York in accordance with the said comprehensive plan as rapidly as may be economically practicable " and confers upon the Port Authority " all necessary and appropriate powers not inconsistent with the Constitution of the United States or of either state, to effectuate the same, except the power to levy taxes or assessments." The Port Authority is expressly declared to be " the municipal corporate instrumentality of the two states for the purpose of developing the port and effectuating the pledge of the states in the said compact." In the congressional resolution ratifying the plan it is specifically stated that " the carrying out and executing of the said plan will the better promote and facilitate commerce between the states and between the states and foreign nations and provide better and cheaper transportation of property and aid in providing better

postal, military, and other services of value to the nation." This indicates clearly that Congress regarded the solution of the port problem as an exercise by the States of an essential function of government.

In 1929 the Port Authority acquired title to the entire square block bounded by West Fifteenth and Sixteenth streets and Eighth and Ninth avenues, in the borough of Manhattan, city of New York. It proceeded to demolish the existing buildings and to erect in their place a sixteen-story large, modern building known as Inland Terminal No. 1. The basement and ground floors are designed for the handling of freight. They have been leased by the Port Authority to eight of the railroads entering New York for a period of five years with the privilege and option, on the part of the railroads, to renew for a number of further periods of five years each. The fourteen upper floors have been constructed for use as store, office and manufacturing space. Leases of portions of these upper stories have been made by the Port Authority to various private businesses wholly unconnected with the problem of transportation. The part of the building which has been leased to the railroads is used as an inland terminal for assembling less than carload freight for each railroad, loading it upon a trailer filled to capacity, and dispatching it to the railhead of that carrier by the most direct route. The terminal is not subdivided among the carriers, but it is a union station. A shipper delivers his freight for all railroads at one point on the platform and a consignee receives his freight from all railroads at one point in the same terminal. A large amount of duplication of trucking has been eliminated, not to mention the enormous saving of time and expense effected.

The complaint alleges that " the erection and construction of such building *other than the erection and construction of the Union Terminal on the street floor and basement* was not authorized, sanctioned, nor permitted by the Laws of the State of New York, or by the compact entered into between the State of New York and the State of New Jersey or by the approval of the Congress of the United States, and that the erection and construction of the said building *excepting so much thereof as is necessary for the Union Terminal purposes, to wit, the basement and street floors*, was undertaken and completed by the Port Authority without sanction, permission or authorization of the State of New York or the State of New Jersey." (¶ 8, italics the court's.) The same allegation is repeated in identical language in the second cause of action. (¶ 28.) These allegations constitute a concession by the plaintiffs that the construction of the street floor and basement for inland terminal purposes was authorized by the terms of the compact and by the

statutes of New York, New Jersey and Congress. The case was tried upon that theory, and it was not until after the close of the trial that the plaintiffs moved to amend their complaint by withdrawing this concession and inserting allegations challenging the legality of the erection of the street and basement floors for terminal purposes. As the motion to amend was denied, it is unnecessary for the purposes of the present action to determine whether the portion of the building devoted to terminal purposes was constructed lawfully or, as plaintiffs now contend, in violation of the compact and the statutes of New York, New Jersey and Congress. In view, however, of the importance of the question and the vital public interest involved, the court believes it appropriate to indicate briefly that it entertains no doubt about the legality and propriety of the construction of the street and basement floors of Inland Terminal No. 1 for terminal purposes. The plaintiffs claim that the comprehensive plan authorized the Port Authority to construct inland terminals only in connection with an underground automatic electric system and that Inland Terminal No. 1 has been illegally constructed because it is served by motor trucks rather than by railroad tracks. This contention rests upon a narrow and strained interpretation of certain language found in the comprehensive plan. The plan, read as a whole, imposes no such restriction upon the right of the Port Authority to establish inland terminals. It vests the Port Authority with discretion to determine " the exact location, system and *character* * * * of each of the * * * warehouses, *terminals* or other improvements * * * after public hearings and further study." (Italics the court's.) The wide discretion conferred upon the Port Authority is emphasized by the direction contained in the comprehensive plan " that definite methods for prompt relief should be devised which can be applied for the better co-ordination and operation of existing facilities while larger and more comprehensive plans for future developments are being carried out." (Comprehensive Plan, § 1, ¶ 9.) The plaintiffs' interpretation of the comprehensive plan is as contrary to its spirit as it is to its letter. It is likewise opposed to the spirit and trend of the compact and of everything that has been accomplished in recent years in the interest of the development of the Port of New York. As learned counsel for the Port Authority well expresses it: " The Joint Report, Compact and the Comprehensive Plan all combine to establish that progress in the solution of the Port Problem is the guiding principle. The conclusion is inevitable that the last thing that was ever intended was to put the Port Authority in a strait-jacket." Indeed, the legality of the construction of Inland Terminal No. 1 must be deemed to have been

adjudicated in the case of *Matter of Port of New York Authority* v. *Lattin* (N. Y. L. J. Dec. 3, 1930). One of the issues in that case was the right of the Port Authority to construct Inland Terminal No. 1. Mr. Justice TOWNLEY (now justice of the Appellate Division, First Department) expressly held that the Port Authority might condemn property for the purpose of erecting Inland Terminal No. 1 and that the construction of the terminal was " within the powers and purposes of the act creating the Port Authority." Further reference to the opinion of Mr. Justice TOWNLEY will be made presently.

We come now to the contention that the construction of the *upper fourteen floors* of Inland Terminal No. 1 was neither authorized nor permitted by the compact or by the statutes of New York, New Jersey and Congress. Although the Port Authority was vested with all powers necessary and appropriate to effectuate the comprehensive plan, the power to levy taxes and assessments was expressly withheld from it. As the States of New York and New Jersey had obligated themselves to appropriate only nominal sums to meet the administrative expenses of the Port Authority, it was necessary that all public projects be planned in a manner which would insure sufficient income to meet the expenses of operation and maintenance as well as the interest and sinking fund requirements of the bonds which the Port Authority was authorized to issue. In other words, each project had to be self-sustaining in order to enable the Port Authority to raise the moneys necessary to finance it. Obviously no inland terminal could be established in the borough of Manhattan on a self-supporting basis without the addition of upper stories to be utilized for revenue-producing purposes. A properly designed terminal would require an extraordinary amount of ground area so that the maximum number of trucks might be accommodated at the freight platforms. A tall structure on a small plot of ground, with all its floors used for terminal purposes only, would not constitute a suitable terminal for it would be a slow and expensive process to transport trucks to and from the upper floors. In view of the high cost of Manhattan real estate, the construction of a building of one or two stories on a large plot of ground upon a self-sustaining basis was a financial impossibility. Without the prospect of obtaining revenue from the renting out of the fourteen upper floors of Inland Terminal No. 1, it is obvious that the Port Authority would have been unable to borrow the funds needed to finance the erection of the terminal. The necessity of constructing terminals containing space designed for industrial and office purposes was foreseen by the Legislatures of both New York and New Jersey. The

joint report to the Governors of both States, upon the basis of which the compact was executed and the comprehensive plan adopted, clearly apprised both Legislatures that it was contemplated that the terminals to be established would contain space for loft, manufacturing and office purposes: " Above that [the portion devoted to terminal purposes] it is proposed to build two additional stories for warehouse purposes, and it is estimated that the revenues that can be obtained from these additional floors will contribute materially to a reduction of the fixed charges against the system. Besides the two warehouse floors incorporated in the design, estimates have been made of the extra cost of and revenues obtainable from two additional floors per terminal for loft, manufacturing or office purposes." (Joint Report, p. 17.) Other statements to the same effect appear in various parts of the joint report (pp. 20, 37, 258, 273 *et seq.*). The architect's sketch of one of the proposed inland terminal buildings depicts a structure with four floors of space designed for manufacturing, loft, office and warehouse uses. With these reports before them the Legislatures of both States authorized the compact which expressly empowers the Port Authority to construct and /or operate " any terminal or transportation facility " and which defines " terminal facility " in very broad terms, and " facility " to include " all works, buildings, structures, appliances and appurtenances necessary and convenient for the proper construction, equipment, maintenance and operation " of " wharves * * * grain or other storage elevators, warehouses, cold storage, tracks, yards, sheds, * * * and every kind of terminal or storage facility now in use or hereafter designed for use for the handling, storage, loading or unloading of freight at steamship, railroad or freight terminals." (Art. XXII.) As previously pointed out, section 8 of the comprehensive plan vests the Port Authority " with all necessary and appropriate powers not inconsistent with the Constitution of the United States or of either State, to effectuate the same [the comprehensive plan], except the power to levy taxes or assessments," while section 6 of the plan provides that " the determination of the exact * * * system and character of each of the * * * terminals or other improvements shall be made by the Port Authority after public hearings and further study." The construction of Inland Terminal No. 1 in its present form was preceded by a public hearing attended by representatives of municipalities, railroads, shippers, consignees, warehousemen, civic and trade associations, property owners and others. After giving due consideration to the views expressed by those present, the authority decided to erect Inland Terminal No. 1 as it stands today. Thereafter, in the report of the Port Authority to the

Governors and Legislatures of New York and New Jersey, dated December 31, 1930, a sketch of the proposed terminal, in the form it ultimately took, was accompanied by the following statement (p. 44): " The structure composing the fourteen additional floors will accord with the requirements of the building code of the City of New York. The ' air rights ' commercialized occupy a volume of thirty million cubic feet, approximately 8% of which will be store and office space and ninety-two per cent the most modern loft space construction. The building will enclose 2,373,140 square feet (gross) of floor space; 152,940 square feet (gross) of which will be for office building purposes and will provide for 112,260 square feet (net) of stores and offices, 282,650 square feet (gross) assigned to Freight Terminal purposes, 1,842,000 square feet (gross) to lofts and light manufacturing purposes, and 95,550 square feet (gross) will be occupied by power, lighting and heating equipment and service facilities   *   *   *. The street floor on Eighth Avenue has been so arranged that the entire frontage, except for the main entrances to the office building, can be occupied by a bank, stores, shops, or for allied purposes." Although similar statements were contained in the annual reports of the Port Authority for 1931 and 1932, no attempt was made by either Legislature to interfere with the construction of Inland Terminal No. 1 in its present form, nor did the Governor of either State exercise the veto power vested in him in respect to the acts of the commissioners appointed to the Port Authority. All the resolutions of the Port Authority authorizing and approving the construction of the building with office, loft and manufacturing space were approved by the Governors of New York and New Jersey. Under these circumstances it appears to be quite clear that the Legislatures of both States contemplated that the Port Authority, in constructing Inland Terminal No. 1, would utilize the air-rights for revenue-producing purposes and also that the acts of the Port Authority in this respect were approved and ratified.

That the construction of the upper floors of Inland Terminal No. 1 was a proper exercise of the powers vested in the Port Authority was squarely held in the case of *Matter of Port of New York Authority* v. *Lattin* (*supra*). Mr. Justice TOWNLEY answered the claim that the construction of the upper story was beyond the intendment of the compact in the following language: " The use of the upper stories of the proposed building to my mind is incidental and does not control the purposes for which the building is to be erected. The primary purpose of acquiring this property is for a terminal from which freight can be distributed at a minimum of cost and a minimum of inconvenience, and I think that is the

controlling purpose to be taken into consideration in determining whether or not the building is within the powers and purpose of the act creating the Port Authority."

As appears from Judge Townley's opinion, the real question to be determined in passing upon the power of a State to engage in private business in connection with the performance of a public function is whether the private use is incidental or paramount. This is well pointed out by the United States Supreme Court in *Kaukauna Water Power Co.* v. *Green Bay, etc., Canal Co.* (142 U. S. 254), where the court held that the State might sell or lease water power created by a dam constructed for the purpose of improving navigation. The court said (p. 273): " But if, in the erection of a public dam for a recognized public purpose, there is necessarily produced a surplus of water, which may properly be used for manufacturing purposes, there is no sound reason why the State may not retain to itself the power of controlling or disposing of such water as an incident of its right to make such improvement. * * * The true distinction seems to be between cases where the dam is erected for the express or apparent purpose of obtaining a water power to lease to private individuals, or where in building a dam for a public improvement, a wholly unnecessary excess of water is created, and cases where the surplus is a mere incident to the public improvement and a reasonable provision for securing an adequate supply of water at all times for such improvement [p. 275]. * * * So long as the dam was erected for the *bona fide* purpose of furnishing an adequate supply of water for the canal and was not a colorable device for creating a water power, the agents of the State are entitled to great latitude of discretion in regard to the height of the dam and the head of water to be created [p. 276]. * * * Courts should not scan too jealously their conduct in this connection if there be no reason to doubt that they were animated solely by a desire to promote the public interests, nor can they undertake to measure with nicety the exact amount of water required for the purposes of the public improvement " [p. 276].

There can be little reason to doubt that the Port Authority was motivated by nothing but a desire to further the public interest and carry out the purposes of the compact and comprehensive plan when it caused Inland Terminal No. 1 to be erected. The addition of the upper floors was merely incidental. Without those floors it was impossible to construct the terminal. The dominant object of the structure was its use for terminal purposes. The Legislatures and Governors of both New York and New Jersey have indicated that they entertain the same views.

With this background the question of the taxability of Inland Terminal No. 1 may now be considered in its proper setting. It is evident from what has already been said that the Port Authority is the governmental agency of two sovereign States. The comprehensive plan expressly declares it to be " the municipal corporate instrumentality of the two states." (Comprehensive Plan, § 8.) As such, the Port Authority is entitled to all of the privileges and immunities of the sovereigns which it represents. (*Kansas City Bridge Company* v. *Alabama State Bridge Corporation*, 59 F. [2d] 48; certiorari denied, 287 U. S. 644.) Thus it has been held that the Palisades Inter-State Park Commission is not subject to the judicial process of the courts of New York or New Jersey. (*Dietrich* v. *Palisades Interstate Park Commission*, 114 Misc. 425, 429; *Stephens* v. *Commissioners of Palisades Interstate Park*, 93 N. J. Law, 500; 108 Atl. 645.) Ships belonging to the Palisades Interstate Park Commission have been determined to be immune to libel, because the property of both of the sovereign States. (*The Onteora*, 298 Fed. 553.) Suit against the Long Island State Park Commission has been held to be a suit against the State and, therefore, not maintainable without the State's consent. (*Pauchogue Land Corporation* v. *State Park Commission*, 243 N. Y. 15, 23.) In the case of *New Jersey Interstate Bridge & Tunnel Commission* v. *Jersey City* (93 N. J. Eq. 550) it was decided that the Bridge and Tunnel Commission was not subject to the municipal regulations of Jersey City, the court declaring that " municipalities are the creatures of the state " and that " the powers given to them are always subject to be abridged or repealed by the sovereign who conferred them."

Upon similar principles an agency of two sovereign States is immune from taxation by municipalities of either State. The compact between New York and New Jersey is the law of both States. It is an amendment of the treaty of 1834 between them and has been approved by Congress. It is, therefore, binding upon the States themselves. No State has the right to violate an agreement with another on the ground that it is sovereign. As Chief Justice WHITE, writing for the United States Supreme Court, said in the case of *Virginia* v. *West Virginia* (246 U. S. 565, at p. 601): " The vesting in Congress of complete power to control agreements between States, that is, to authorize them when deemed advisable and to refuse to sanction them when disapproved, clearly rested upon the conception that Congress, as the repository not only of legislative power but of primary authority to maintain armies and declare war, speaking for all the States and for their protection, was concerned with such agreements, and therefore was

virtually endowed with the ultimate power of final agreement which was withdrawn from state authority and brought within the federal power. It follows as a necessary implication that the power of Congress to refuse or to assent to a contract between States carried with it the right, if the contract was assented to and hence became operative by the will of Congress, to see to its enforcement."

To permit a municipality of the State of New York to impose a tax or levy against the property of the Port Authority located within its territorial limits would destroy the rights and privileges conferred upon the State of New Jersey by the compact. The power of taxation " is an incident of sovereignty, and is co-extensive with that to which it is an incident. All subjects over which the sovereign power of a State extends, are objects of taxation; *but those over which it does not extend, are, upon the soundest principles, exempt from taxation.* This proposition may almost be pronounced self-evident." (Chief Justice MARSHALL in *McCullough* v. *Maryland,* 4 Wheat. 316, at p. 429; italics ours.)

As a result of the compact the property of the Port Authority became exempt from taxation by either State. As " the power to tax involves the power to destroy," the very existence of the Port Authority would be seriously jeopardized if States or their municipalities could lawfully tax the property of the Port Authority within their respective jurisdictions.

Moreover, it is well settled that agencies of the State are exempt from taxation unless specifically rendered subject to tax by statute. In *People ex rel. Mayor, etc., of N. Y.* v. *Assessors* (111 N. Y. 505) the Court of Appeals said (p. 509): " We think the landing place was not taxable, upon the principle that property of a municipality acquired and held for governmental and public uses, and used for public purposes, is not a taxable subject within the purview of the tax laws, unless specially included. * * * the power to tax the landing cannot be spelled out from general words, subjecting to taxation all real and personal property within the State. This principle of construction is well settled." To the same effect are *People ex rel. Bear Mountain Hudson River Bridge Co.* v. *Diamond* (126 Misc. 239; affd., *sub nom. People ex rel. Bear Mountain, etc., Bridge Co.* v. *James,* 222 App. Div. 756); *City of Rochester* v. *Town of Rush* (80 N. Y. 302); *Matter of Village of Delhi* (201 id. 408). In New Jersey the law is the same. In *Newark* v. *Verona Township* (59 N. J. Law, 94) the court declared that " even in the absence of an express provision exempting the property of a state and its political subdivisions from taxation, such property is, by implication, excluded from the operation of laws imposing taxation, unless there is a clear expression of intention to include it." In

*Jersey City* v. *Blum* (101 N. J. Law, 93) the court expressed the same view. The real basis of the immunity from taxation enjoyed by a State and its agencies is the right of the sovereign to hold property which is devoted to the public use.

The claim of the plaintiffs that the property of the Port Authority is taxable in view of the provisions of sections 3 and 4 of the Tax Law of this State requires little discussion. It is true, as the plaintiffs point out, that section 3 provides that all real property within the State and all personal property situated or owned within the State, is taxable unless exempt from taxation by law, and that section 4, which lists various kinds of exempt property, does not specifically mention the property of the Port Authority. The compact, however, clearly contemplated that the property of the Port Authority was not to be subject to the taxing power of all the various municipalities within which property of the Port Authority might be situated. That the Legislatures of both States regarded the property of the Port Authority as immune from taxation is confirmed by the very language of chapter 553 of the New York Laws of 1931 and of chapter 69 of the New Jersey Laws of 1931. These statutes authorize the making of a voluntary agreement by the Port Authority " to the end that * * * municipalities in the port of New York district, may not suffer undue loss of taxes and assessments by reason of the acquisition and ownership of property therein by the Port of New York Authority "— a distinct indication that in the absence of an agreement the Port Authority was not obligated to make any payment. Since the provisions of the compact, as previously observed, constitute the law of both signatory States, they modify, by implication, any conflicting statute of either State. The same Legislature which enacted sections 3 and 4 of the Tax Law has the power to modify and even repeal them. Furthermore, the property of the Port Authority may well be regarded as coming within the scope of subdivisions 2 and 3 of section 4 of the Tax Law which expressly exempt from taxation " property of this state " and " property of a municipal corporation of the state held for a public use." It will be remembered that the comprehensive plan adopted by the Legislatures of both States specifically declared the Port Authority to be " the municipal corporate instrumentality of the two States for the purpose of developing the port and effectuating the pledge of the states in said compact." (§ 8.)

Nor does the exemption of Inland Terminal No. 1 from municipal taxation violate section 18 of article 3 of the New York State Constitution which prohibits the Legislature from passing " a private or local bill * * * granting to any person, association, firm, or

corporation, an exemption from taxation on real or personal property." Clearly the exemption in the instant case is not the result of a bill "private or local" in terms or in effect. The Port Authority is engaged in the exercise of a most important governmental function obviously public in character. The Port Authority is not a private corporation. It is a "body corporate and politic." (Compact, art. III.)

Does the use of the upper floors of Inland Terminal No. 1 for revenue-producing purposes unconnected (except remotely) with the transportation problem, which the Port Authority has been created to solve, destroy or forfeit any claim to tax exemption which the Authority might otherwise possess? The plaintiffs contend that it does. The court is, however, of a contrary opinion. The tax exempt status of property held for a public use is not affected by the utilization of the revenue-producing attributes of the property for the purpose of paying part or all of the cost and expense of operating the property for the public benefit. (*Temple Grove Seminary* v. *Cramer*, 98 N. Y. 121; *People ex rel. N. Y. University* v. *Wells*, 94 App. Div. 271; *People ex rel. Salvation Army* v. *Feitner*, 33 Misc. 712; affd., 68 App. Div. 639; *People ex rel. Trustees* v. *Dohling*, 6 id. 86.) Inland Terminal No. 1 cannot properly be separated into two distinct parts — the terminal portion on the one hand, and the upper floors on the other. It is a single self-sustaining governmental unit. Its revenue-producing features are availed of only for the purpose of making possible the performance of the governmental function of facilitating transportation. If the Port Authority possessed the power to acquire land by eminent domain for the construction of Terminal No. 1 in its present form, it would seem to follow that it also enjoys the right to hold such property free from taxation by various municipalities.

In view of the fact that Inland Terminal No. 1 is exempt from taxation by the city of New York, it is evident that the proposed agreement by the terms of which the Port Authority obligates itself to pay $60,064.10 annually to the city, is beneficial rather than prejudicial to the municipality and its taxpayers. It gives the city funds which it would not otherwise be entitled to receive. It takes nothing away from the city. No illegal act or waste of public moneys is involved. The first cause of action, predicated upon the provisions of section 51 of the General Municipal Law, must, therefore, be dismissed, with an exception to the plaintiffs.

The second cause of action, prosecuted by the plaintiffs as competing property owners, may be briefly disposed of. A decisive answer to the plaintiffs' argument that granting exemption from taxation to the Port Authority constitutes an unfair discrimination against

the plaintiffs is that the Constitution of the State of New York does not require absolute uniformity of taxation. The power to classify and select the subjects of taxation necessarily implies the power to exempt. As was said in *Hermitage Company* v. *Goldfogel* (204 App. Div. 710, at p. 729; affd., 236 N. Y. 554): " ' The right to make exemptions is involved in the right to select the subjects of taxation and apportion the public burdens among them, and must consequently be understood to exist in the law-making power wherever it has not in terms been taken away. To some extent it must exist always, for the selection of subjects of taxation is of itself an exemption of what is not selected.' " " The legislature must decide when and how and for what public purposes a tax shall be levied, and must select the subjects of taxation." (Cooley Taxation [3d ed.], p. 255.) As long as the classification adopted by the Legislature is reasonable and not arbitrary, no successful attack can be made upon legislation taxing certain classes of property and exempting others.

It is well established that the exemption of property of a municipality or other agency of a State from taxation does not violate the equal protection clause of the Fourteenth Amendment to the Constitution of the United States. In *South Carolina Power Co.* v. *South Carolina Tax Commission* (52 F. [2d] 515; affd., 286 U. S. 525) the Circuit Court of Appeals said: " Such * * * municipalities are manifestly in an entirely different class from power companies generating electricity for sale to the public. * * * So far as the exemption accorded municipalities is concerned, a municipality is an agency of the state, and its operations are conducted, not for private profit, but for the benefit of the public or its citizens. * * * Its property and business conducted by it are ordinarily not taxed at all; and legislation of the state taxing or exempting same from taxation is not open to the objection that it offends the equal protection clause of the Fourteenth Amendment."

The great latitude allowed in reference to taxing statutes is pointed out by Mr. Justice ROBERTS, writing for the United States Supreme Court in *Tax Commissioners* v. *Jackson* (283 U. S. 527, at p. 537): " The power of taxation is fundamental to the very existence of the government of the States. The restriction that it shall not be so exercised as to deny to any the equal protection of the laws does not compel the adoption of an iron rule of equal taxation, nor prevent variety or differences in taxation, or discretion in the selection of subjects, or the classification for taxation of properties, businesses, trades, callings, or occupations. * * * ' If the selection or classification is neither capricious nor arbitrary,

and rests upon some reasonable consideration of difference or policy, there is no denial of the equal protection of the law.' "

In *Green* v. *Frazier* (253 U. S. 233) the United States Supreme Court upheld legislation of the State of North Dakota which authorized agencies of the State to build and operate warehouses, elevators, packing houses and flour mills, and which created a State bank to do the necessary financing. The court said (pp. 242, 243): " In many instances States and municipalities have in late years seen fit to enter upon projects to promote the public welfare which in the past have been considered entirely within the domain of private enterprise. Under the peculiar conditions existing in North Dakota, which are emphasized in the opinion of its highest court, if the State sees fit to enter upon such enterprises as are here involved, with the sanction of its Constitution, its legislature and its people, we are not prepared to say that it is within the authority of this court, in enforcing the observance of the 14th Amendment, to set aside such action by judicial decision." The fact that the legislation put the State into competition with others engaged in private business was not considered to be a valid ground for declaring the law unconstitutional.

Similarly, in the very recent case of *Puget Sound Co.* v. *Seattle* (291 U. S. 619; 78 L. Ed. 664, decided March 19, 1934) the United States Supreme Court, Mr. Justice Stone writing the opinion, said (pp. 624–626): " In conducting the business by state authority the city is exercising a part of the sovereign power of the state which the Constitution has not curtailed. The decisions of this Court leave no doubt that a state may, in the public interest, constitutionally engage in a business commonly carried on by private enterprise, levy a tax to support it, * * * and compete with private interests engaged in a like activity. * * * The equal protection clause does not forbid discrimination with respect to things that are different. The distinctions between the taxing sovereign and its taxpayers are many and obvious. The private corporation, whatever its public duties, carries on its business for private profit and is subject to the obligation, common to all, to contribute to the expense of government by paying taxes. The municipality, which is enabled to function only because it is a tax gatherer, may acquire property or conduct a business in the interest of the public welfare, and its gains if any must be used for public ends. Hence equal protection does not require a city to abstain from taxing the business of a corporation organized for profit merely because in the public interest the municipality has acquired like property or conducts a like business. These differences are not lessened nor the constitutional exaction of uniformity increased

because the city competes with a business which it taxes. * * * These considerations are in no way affected by calling the city's activity ' proprietary ' instead of ' governmental.' * * * The Fourteenth Amendment does not purport to protect property from every injurious or oppressive action by a state. * * * It does not preclude competition, however drastic, between private enterprises or prevent unequal taxation of competitors who are different. * * * Such was the decision in *Madera Waterworks* v. *Madera* [228 U. S. 454], where this Court pointed out that in the absence of any contract restriction the Fourteenth Amendment does not prevent a city from conducting a public water works in competition with private business or preclude taxation of the private business to help its rival to succeed."

In the light of the foregoing the second cause of action is without merit and must be dismissed, with an exception to the plaintiffs.

All motions to strike out as to which decision was reserved are denied, with appropriate exceptions. Judgment for the defendants. Submit decision and judgment on notice.