The WILMINGTON PARKING AUTHOR-
ITY, a public body, corporate and poli-
tic, exercising public powers of the
State of Delaware, as an agency thereof
pursuant to Chapter 5 of Title 22 of the
Delaware Code of 1953, as amended,
Plaintiff Below, Appellant,

v.

LAND WITH IMPROVEMENTS, SITU-
ATE IN the CITY OF WILMINGTON,
NEW CASTLE COUNTY, State of Del-
aware, known as 227 West 8th Street,
Theodore G. Hantzandreou and Labrini
T. Hantzandreou, and Other Unknown
Parties in Interest, Defendants Below,
Appellees.

Supreme Court of Delaware.

Submitted: Sept. 30, 1986.
Decided: Oct. 1, 1986.
Opinion Issued: March 2, 1987.

Howard M. Handelman (argued) and Peter J. Walsh, of Bayard, Handelman & Murdoch, P.A., Wilmington, for appellant.

Carl A. Agostini (argued), Louis P. Agostini, Jr., and David T. Smith, Esquire, of Agostini & Agostini, Wilmington, for appellees.

Before CHRISTIE, C.J., HORSEY and MOORE, JJ.

CHRISTIE, Chief Justice:

In this appeal the Court was called upon to determine whether the Superior Court erred in ruling that under the special circumstances of this case, the Wilmington Parking Authority ("WPA") lacked the authority to condemn certain land in downtown Wilmington pursuant to its statutorily delegated power of eminent domain. The Superior Court prevented the condemnation from going forward because it found that the primary purpose of the project involving the land to be condemned was to benefit public and private interests which lay outside the WPA's statutory mandate. After an expedited review, we affirmed the court's decision. *Wilmington Parking Authority v. Hantzandreou*, No. 265, 1986, Christie, C.J., (October 1, 1986). 516 A.2d 483. We now set forth the reasons for our affirmance.

## I.

The WPA is an agency of the State incorporated under 22 *Del.C.* ch. 5. Any authority established thereunder shall be for certain enumerated purposes:

> The authority shall be for the purpose of conducting the necessary research activity, to maintain current data leading to efficient operation of off-street parking facilities, for the fulfillment of public needs in relation to parking, establishing a permanent coordinated system of parking facilities, planning, designing, locating, acquiring, holding, constructing, improving, maintaining and operating, owning or leasing, either in the capacity or (sic) lessor or lessee, land and facilities to be devoted to the parking of vehicles of any kind.

22 *Del.C.* § 504(a). To achieve these purposes, an authority created under chapter 5 of Title 22 is delegated the power of emi-

nent domain. 22 *Del.C.* § 504(b)(12). The General Assembly has specifically provided that "the authority may acquire ... by eminent domain proceedings either the fee or such rights, title, interest, or easement in such lands as the authority deems necessary *for any of the purposes mentioned in this chapter.*" 22 *Del.C.* § 508 (emphasis added).

The WPA commenced a condemnation proceeding pursuant to its grant of the power of eminent domain. In its motion for immediate possession, the WPA alleged that the condemnation of the real property at issue here was necessary in order to construct a public parking facility. The land is located in a downtown area designated the "Red Zone" by the WPA because of the serious shortage of parking facilities there. The project proposed by the WPA involved the construction of a seven-level parking garage with space for approximately 950 automobiles. The building would be constructed to occupy substantially all of an entire block.

The plan called for the WPA to transfer the property interest in most of the property it acquired to the Gannett Co., Inc., which has as one of its divisions the News-Journal Company ("News-Journal"). The News-Journal's principal facility was already located on land adjacent to the property sought to be condemned. In return, the News-Journal was to convey to the WPA the air rights over the condemned property as well as certain property rights on its present property for construction of the access ramps for the garage. The News-Journal was to receive title to the land condemned and also a payment in the amount of $864,000 for the sale of the air space over its presently owned property. The WPA would, however, have ample space to build the proposed garage and ramps to the garage.

The agreement would have allowed the News-Journal to construct an addition to its present facility enabling it to expand its operation. The addition would occupy substantially all of the property sought to be acquired by the WPA up to a height of approximately thirty-five feet. Thus, there was evidence that the News-Journal's expansion of its facility was the key factor in the overall project.

Attached to its complaint was a document titled the "Preambles and Resolutions of the Wilmington Parking Authority Adopted November 26, 1985," (the "Resolution") in which the WPA set forth the considerations that led it to enter into an agreement with the News-Journal and to seek to condemn the land at issue. The document states: (a) that the WPA determined, after exploration of two other possible sites, that the block on which the News-Journal's land is located would constitute the most desirable location for construction of a garage; (b) that condemnation of the properties owned by the News-Journal on that block would be financially unfeasible; (c) that in order to meet the critical parking needs in the Red Zone by construction of the garage on the site, the WPA entered into negotiations with the News-Journal for the purpose of determining whether it was feasible for the WPA to construct a facility on the site while at the same time not proceeding with condemnation against the News-Journal; and (d) that, as the result of extensive negotiations, the parties reach an understanding for a plan that would accommodate the needs and desires of each party.

A part of the land which the WPA and the News-Journal needed for the project was owned by Theodore G. Hantzandreou and Labrini T. Hantzandreou ("owners"). The owners operate a restaurant known as "Libby's" at that location. They alleged, among other things, that the primary purpose of the proposed condemnation and subsequent taking was to benefit the News-Journal, and that, therefore, the taking was beyond the statutory authority of the WPA and in violation of the State and Federal constitutions.

The Superior Court held three days of hearings on the issue of whether or not the proposed taking was for a "public purpose" as required case law construing the State

and Federal constitutions.[1] The evidence presented at those hearings indicated that the genesis of the project was markedly different from that indicated by the Resolution. The evidence showed that the News-Journal had been interested in expanding its operations for several years, and that the City of Wilmington had made at least two previous offers, one in 1983 and another in 1984, by which it sought to enable the News-Journal to relocate within the City. By June of 1985, the City knew that the News-Journal had an option on land outside the City. The Mayor then instructed his Director of Commerce, Mr. Casey, to do what he could to keep the News-Journal in the City.[2]

In late June, 1985, Mr. Casey called the Chairman of the WPA, Mr. Wharton, and suggested the possibility of a joint project involving the WPA and the News-Journal. The WPA then listed the News-Journal project as an "anticipated development" in its study of parking needs dated July 1, 1985. Until the conversation between Mr. Casey and Mr. Wharton in late June, the WPA had not considered a project on this particular site.

WPA officials discussed the possibility of a joint project in July, 1985. Shortly thereafter, a letter drafted by Mr. Casey and signed by the Mayor assured the President of the News-Journal of the City's continued desire to keep the News-Journal in town. The letter stated in part:

> I would like to reiterate the comment that John Casey made to you the other day on behalf of my administration and the Wilmington Parking Authority.
>
> The Wilmington Parking Authority is most willing to acquire the land that your company does not presently own in the block immediately south of your existing building. to accommodate all of your needs. This would allow for the accomplishment of your expansion needs,

in addition to providing much needed parking.

The Superior Court found that the chronological development of the interest of the WPA in the project provided insight into the "motivating factor" in the decision of the WPA to proceed with the project. The court also noted that the WPA had disposed of or was in the process of disposing of properties including over 500 public parking spaces located within ten to twelve blocks of the proposed site. The court suggested that such action provided inferential evidence as to the need or lack of need for parking spaces in that general area of the City.

In light of this evidence, the Superior Court found that the proposal of the WPA was primarily motivated by the purpose of benefiting the economic interests of the City in retaining a substantial corporate citizen. It also found that the paramount benefit to be obtained by this project was to the News-Journal. In addition, the court ruled that 22 *Del.C.* ch. 5 did not authorize the WPA to contract to convey lands yet to be acquired by eminent domain. The court ruled against the WPA on these three grounds.

On appeal, the WPA contends that the Superior Court erred in inquiring into the motivating desire of the WPA in proposing the project with the News-Journal. The WPA also argues that the finding that the News-Journal was the primary beneficiary of the project was clearly erroneous. Finally, the WPA contends that the court erred in ruling that contracting to convey land yet to be condemned lay outside the WPA's statutory authority.

For the reasons set forth below, we affirm the decision of the Superior Court based on its ruling that the WPA did not act within its statutorily limited purpose of providing for needed public parking. This ruling is supported by findings of fact that the WPA was primarily motivated by a

---

1. *See* discussion in part II. A *infra.*

2. Mr. Casey, the City's Director of Commerce, was the City's liaison with the WPA. He regularly attended meetings of the Board of Directors of the WPA. There are close ties be-

tween the City and the WPA, since, when the WPA needs to finance a project through a bond program, the City must pledge its "full faith and credit" in order for the bonds to be issued.

desire to help the City retain the News-Journal as a corporate citizen, and that paramount benefit of the project would be to the News-Journal. We do not reach the third ground of the Court's decision dealing with WPA's right to enter into a contract to convey land it has not yet acquired.

## II.

This Court has addressed on at least two occasions the question of whether a taking which results in a substantial benefit to private interests may nevertheless be for "public use" as required by the State and Federal constitutions. *Wilmington Parking v. Ranken*, Del. Supr., 105 A.2d 614 (1954), and *Randolph v. Wilmington Housing Authority*, Del.Supr., 139 A.2d 476 (1958). In these cases the Court ruled that agencies of the State may condemn private property provided that the primary purpose of the condemnation is to benefit the public. We now consider the "primary purpose" rule in the context of a contention that a proposed condemnation is for a purpose not consistent with the statutory purpose for which the General Assembly has delegated the power of eminent domain. Although we examine the primary purpose rule as it developed in the constitutional context, we apply it here to determine whether the WPA's proposed condemnation was invalid as beyond its statutory purpose, i.e., to provide public parking.

### A.

■ Article I, Section 8 of the Delaware constitution states that no person's "property [shall] be taken or applied to public use without the consent of his representatives, and without compensation being made." This State constitutional provision mirrors its Federal counterpart, the fifth amendment of the United States Constitution, which provides "... nor shall private property be taken for public use, without just compensation." Implicit in this language are two underlying assumptions: (1) that the government has the power to take private property, and (2) that it may be so taken only for a public purpose. *Thomi-*

*son v. Hillcrest Athletic Ass'n.*, Del.Super., 5 A.2d 236 (1939).

■ The determination of what constitutes a public purpose is ultimately a judicial question. *Wilmington Parking Authority v. Ranken*, 105 A.2d 614, citing *City of Cincinnati v. Vester*, 281 U.S. 439, 50 S.Ct. 360, 74 L.Ed. 950 (1930). Generally, when the exercise of eminent domain results in a substantial benefit to specific and identifiable private parties, "a court must inspect with heightened scrutiny a claim that the public interest is the predominant interest being advanced." *Poletown Neighborhood Assoc. v. City of Detroit*, Mich.Supr., 410 Mich. 616, 304 N.W.2d 455, 459 (1981). In determining whether projects with substantial benefit to private parties are for a public purpose, this Court has held that the trial court must examine the "underlying purpose" of the condemning authority in proposing a project as well as the purpose of the project itself. *Ranken*, 105 A.2d 614.

In *Ranken*, the Court considered a project which called for the construction of a parking facility in which nearly forty percent of the space was to be leased for nonrelated commercial purposes. In determining that the project was for a public use or purpose and, therefore, was not in violation of the public use clause, the Court ruled:

> Since the dominant or underlying purpose of the contemplated project subserves a public use, commercial leasing of space therein for uses unrelated to the public use is permitted to the extent, and only to the extent, that such leasing is necessary and feasible to enable the Authority to finance the project.

105 A.2d at 627. Recognizing that the test of economic necessity could be carried to dangerous extremes, the Court cautioned:

> First, the reviewing court must be satisfied that the underlying purpose—the motivating desire—of the public authority is the benefit to the general public. If a self-styled project is so designed that in

fact private interests are the chief beneficiaries, a remedy is available. *Id.* at 626.

In an example illustrating the application of this test, the Court indicated that the proper inquiry focused on the design of the project and on the question of whether public or private interests were the chief beneficiaries. *Id.* However, the Court's initial statement, that the reviewing court must be satisfied that the "underlying purpose" or "motivating desire" of the public authority is the benefit to the public, suggests an inquiry into the motivation of the authority. Indeed, earlier in its opinion the *Ranken* court quoted at length, with approval, a New York appellate court decision which called for consideration of the motivation of a public authority in proposing a taking. *Id.* at 623, 624, quoting *Bush Terminal Co. v. City of New York*, N.Y.Sup., 152 Misc. 144, 273 N.Y.S. 331 (1934). The *Ranken* court stated:

> Courts should not scan too jealously th[e] conduct [of public authorities] in this connection if there be no reason to doubt that they were animated solely by a desire to promote the public interest.... 273 N.Y.S. at 345.

*Id.* at 624.

Four years after the *Ranken* decision, in *Randolph v. Wilmington Housing Authority*, 139 A.2d 476, this Court again considered the constitutionality of a taking which resulted in substantial benefits to private interests. In upholding the constitutionality of the "Slum Clearance and Redevelopment Act of 1951," 31 *Del.C.* ch. 45, the Court reaffirmed that "the State may not constitutionally condemn private property if the primary purpose of the condemnation is the transfer of the property to private use." 139 A.2d at 483 (citations omitted). The Court also noted that, in determining whether the primary purpose

of a project is public or private, the cases tend "to classify the object according to its primary consequences and effects." *Id.* at 483.

Taken together, the *Ranken* and *Randolph* decisions indicate that a primary purpose determination in a constitutional context will normally turn upon the "consequences and effects" of a proposed project. However, those decisions also suggest that a reviewing court may consider evidence concerning the "underlying purpose" of a public authority in proposing a project. A recent Florida case, decided on constitutional grounds, also supports the position that evidence concerning the views of persons intimately involved with the initiation of a project is relevant to determining the "true purpose" of a taking. *See Baycol Inc., v. Downtown Development Authority*, Fla. Supr., 315 So.2d 451 (1975). In rejecting the alleged public purpose of a taking, the *Baycol* court found "interesting" the testimony of a witness for the authority which suggested that he was unfamiliar with the public parking aspect of a multi-purpose project. *Id.* at 458.

■■■ In the context of determining whether a State agency acted within the scope of a limited delegation of the power of eminent domain, inquiry into the underlying purpose of a proposed taking is perhaps even more appropriate. In addition to the constitutional values at stake, the exercise of a statutorily delegated power raises problems concerning the proper role of the agency as defined by the legislature. Generally, the burden is on the condemnor to show that it is acting within the scope of its statutory power. 1A J. Sackman, *Nichols' The Law of Eminent Domain* § 3.213 (Rev. 3rd ed. 1985).[3] Even when the power of eminent domain is expressly granted, the extent thereof will be construed strictly

---

**3.** Superior Court Rule of Civil Procedure 71.1 provides that

> In all such condemnation proceedings the burden shall be upon the property owner to overcome the presumption of regularity and the prima facie case of necessity for a public use presented by the institution of such proceeding.

The question here, whether an attempted exercise of the power of eminent domain was for the statutory purposes required by 22 *Del.C.* § 504(a) and § 508, does not fall within the ambit of Rule 71.1. We understand the Rule to refer to issues of bad faith and abuse of discretion. *See Arkansas State Highway Comm. v. Morgan's Estate*, Ark.Supr., 243 Ark. 450, 420 S.W.2d 525, 527 (1967).

against the grantee. *Id.* at § 3.213[1]; *see also State v. 0.6878 Acres of Land*, Del.Super., 105 A.2d 205 (1954).

■ The WPA is statutorily authorized to exercise the power of eminent domain only "for the purposes mentioned in [22 *Del.C.* ch. 5]"—that is, for public parking. 22 *Del.C.* § 508. In view of the concerns outlined above, a reviewing court should not unduly limit its inquiry in determining whether the primary purpose of a proposed project falls within an agency's statutory authority. Although the inquiry should focus primarily on whether the statutorily defined interests are the chief beneficiaries of the project, the court may properly consider evidence indicating whether the condemning authority was motivated by concerns not within its statutory mandate.

■ The Superior Court committed no error of law in considering the primary motivation of the WPA, as well as the benefits actually to be obtained by private interests and the parking public, in determining whether the primary purpose of the project at issue was consistent with the WPA's statutory mandate.

### B.

■ The Superior Court found that the WPA was primarily motivated by the purpose of benefiting the City by retaining the News-Journal as a corporate citizen, and that the primary beneficiary of the project would be the News-Journal rather than the public. Our scope of review of these findings of fact is limited:

> If [the findings] are sufficiently supported by the record and are the product of an orderly and logical deductive process, in the exercise of judicial restraint we accept them, even though independently we might have reached opposite conclusions. It is only when the findings below are clearly wrong and the doing of justice requires their overturn that we are free to make contradictory findings of fact.

4. We do not construe the finding of the Superior Court to mean that the WPA cannot pursue a project merely because the City first suggested it. The WPA may be motivated by a desire to

*Levitt v. Bouvier*, Del.Supr., 287 A.2d 671, 673 (1972).

There is evidence in the record which indicates that the City, through Mr. Casey, enlisted the assistance of the WPA to achieve the City's goal of retaining the News-Journal. Mr. Casey wrote on "behalf of the WPA" that the WPA would be "willing to accommodate all your needs." The WPA contended that its interest was solely in parking, distinct from the City's interests.

In resolving this apparently conflicting evidence, the court may have taken into account the Resolution included in the WPA's complaint. The Resolution suggests that the WPA first developed an interest in condemning a much larger piece of land including the property on which the News-Journal's facility is located, but that, after determining that condemnation of the News-Journal's land would be financially unfeasible, the WPA began negotiations with the News-Journal to accommodate its needs. The WPA admitted at oral argument, however, that such a characterization was perhaps a bit contrived. This mischaracterization could well have given rise to an inference that the WPA did not in fact act independently for its proper statutory purposes in proposing the project. In any event, there is sufficient evidence in the record to support the court's finding that the WPA was motivated by concerns that lay outside its statutory mandate.[4]

■ The court also found that the paramount benefit to be obtained by the project was to the News-Journal. There is evidence that, at the same time that the WPA was pursuing its project with the News-Journal, it had disposed of or was in the process of disposing of properties that provided approximately 500 parking spaces for the public within ten to twelve blocks of the News-Journal project site. The court also noted that approximately ten percent

promote parking even though the City's desire in suggesting the project is to retain a valued employer.

of the 950 new spaces would be reserved for News-Journal employees. In light of this evidence, the trial judge estimated that the net benefit to the public would be less than 350 spaces. The court also noted that the News-Journal would receive the benefit of acquiring land contiguous to its present downtown facilities, land which apparently was not available on the open market.

The WPA contends that the sale of properties by the WPA does not indicate a lack of need for parking in the area. It points out that it obtained agreements with the parties purchasing the properties obligating those parties to build private parking lots in buildings to be constructed thereon. These parking facilities, the WPA argues, will benefit the public because they will reduce the "competition" for public parking spaces.

The WPA also argues persuasively that the benefit to the public is great for three reasons: (1) the size of the garage, which at 950 parking spaces would be the second largest in Wilmington; (2) the location, in the Red Zone in which the WPA projects there will be a deficiency of 6,000 parking spaces by 1990; (3) the price, which the WPA estimates to be lower per parking space than several of its other recent projects.

These arguments amount to differing views as to the significance of the evidence presented to the trier of fact. In light of the evidence concerning the underlying purpose of the WPA in initiating the project and the evidence as to the benefits private industry expected to obtain from the project, we cannot say that the findings of the trial court are clearly wrong. There is sufficient evidence to support the ultimate finding that the primary purpose of the project was to retain the News-Journal as a corporate citizen rather than to provide the public with parking facilities. Therefore, the WPA's attempted exercise of its limited power of eminent domain was beyond its statutory authority.

Our holding today, based on the factual record before us, announces no new principle of law. As this Court indicated in *Ranken*, the fact that a parking facility will have multiple purposes does not in and of itself render the proposed taking one for private rather than public purposes. However, the primary objective has to be parking. Based upon the trial court's record, this was not the case here. Under the particular circumstances of this case, the ruling of the Superior Court was affirmed.

## ORDER

This 1st day of October, 1986,

Upon consideration of the briefs of the parties and their contentions at oral argument, it appears to the Court that:

(1) Plaintiff Wilmington Parking Authority ("WPA") commenced this action pursuant to its grant of the power of eminent domain, 22 *Del.C.*, c. 5, alleging that condemnation of certain property located at the corner of Eighth and Tatnall Streets is necessary to construct a public parking garage. WPA planned to convey the condemned land to the News Journal to accommodate an expansion of its facilities and to build a public parking garage of seven levels on top of an expanded News Journal facility. The owners of land involved ("Owners") alleged that the primary purpose of the taking was to benefit the News Journal, and that, therefore, the taking was beyond the statutory authority of WPA.

After an evidentiary hearing, the Superior Court denied WPA's motion for immediate possession on August 11, 1986, finding that WPA was primarily motivated by the purpose of benefiting the News Journal. In view of a time deadline on WPA's contractual arrangement with the News Journal for construction on the land at issue, this Court agreed to an expedited review and will announce its decision in this Order. An Opinion will follow at a later date.

(2) In *Wilmington Parking Authority v. Ranken*, Del.Supr., 105 A.2d 614 (1954), this Court stated that:

... the reviewing court must be satisfied that the underlying purpose—the motivating desire—of the public authority is the benefit to the general public. If a self-styled project is so designed that in

fact private interests are the chief beneficiaries, a remedy is available.

105 A.2d at 626. This test instructs the trier of fact to examine the motivations of the parking authority and the objective benefits that accrue to the general public versus private interests. The issues presented are bottomed on the factual determinations of the trial court. Under such circumstances, our scope and standard of review are limited by the following holding in *Levitt v. Bouvier*, Del.Supr., 287 A.2d 671 (1972):

> If [findings made by the trial judge] ... are sufficiently supported by the record and are the product of an orderly and logical deductive process, in the exercise of judicial restraint, we accept them even though independently we might have reached opposite conclusions. It is only when the findings below are clearly wrong and the doing of justice requires their overturn that we are free to make contradictory findings of fact.

287 A.2d at 673. Under the circumstances of this case, this Court cannot say that the trial judge was clearly wrong in finding that the News Journal was the primary beneficiary of the proposed project. There was sufficient evidence in the form of written documents and the testimony of the WPA's own witnesses to support that conclusion. The Superior Court made no error in law. Therefore, even if this Court would have reached a different result, we must, in the exercise of judicial restraint, affirm.

(5) Our holding today, based on the factual record here, announces no new principle of law. We express no view that any similar public parking project is beyond the legal authority of the WPA when based on an adequate factual record which comports with the mandate of *Wilmington Parking Authority v. Ranken, supra.*

NOW, THEREFORE, IT IS ORDERED that the judgment of the Superior Court is AFFIRMED.