THE PORT OF NEW YORK AUTHORITY, PLAINTIFF, v. THE CITY OF NEWARK, LEO P. CARLIN, AS A MEMBER OF THE BOARD OF COMMISSIONERS OF THE CITY OF NEWARK, SALVATORE A. BONTEMPO, AS A MEMBER OF THE BOARD OF COMMISSIONERS OF THE CITY OF NEWARK, PEARCE R. FRANKLIN, AS A MEMBER OF THE BOARD OF COMMISSIONERS OF THE CITY OF NEWARK, JOHN B. KEENAN, AS A MEMBER OF THE BOARD OF COMMISSIONERS OF THE CITY OF NEWARK, AND MEYER C. ELLENSTEIN, AS A MEMBER OF THE BOARD OF COMMISSIONERS OF THE CITY OF NEWARK, AS DIRECTOR OF THE DEPARTMENT OF REVENUE AND FINANCE AND AS COLLECTOR OF TAXES OF THE CITY OF NEWARK, DEFENDANTS.

Superior Court of New Jersey
Law Division

Decided March 25, 1955.

Civil action in lieu of prerogative writ.

*Mr. Russell E. Watson,* attorney for plaintiff.

*Mr. Vincent P. Torppey,* Corporation Counsel of The City of Newark, attorney for defendants.

COLIE, J. S. C. This action in lieu of prerogative writ is brought by the Port of New York Authority, hereinafter called "Port Authority," against the City of Newark and the Board of Commissioners, to set aside tax assessments by the city for the years 1952 and 1953 on the Newark Union Motor Truck Terminal.

The Port Authority contends that the terminal is tax exempt because the Port Authority is a governmental agency exercising governmental functions, and that the present use of the Newark truck terminal is for a public purpose. The Port Authority further contends that under *chapter* 69 of the *Laws of* 1931, *R. S.* 32:1–144, it is authorized to make payments to municipalities in lieu of taxes; that the terminal is exempt under the compact which, it is argued, precludes taxation of its property by one state, or its political subdivisions, without the consent of the other state, in this case New York. By its answer, the city raised a number of affirmative defenses, among others that the Port Authority had not exhausted its administrative remedies before instituting the present action; that the "in-lieu-of-tax" statute, *chapter* 69, *Laws of* 1931, was an unconstitutional delegation

of legislative power; that the property was not devoted to a public use on the assessing dates of October 1, 1951 and 1952.

In 1917 the Legislatures of New Jersey and New York authorized the appointment of a joint commission to make recommendations for the development of the Port of New York. Thereafter, New Jersey and New York executed a compact which was consented to by Congress. By that compact the Port Authority was granted "full power and authority to purchase, construct, lease and/or operate any terminal or transportation facility within said district; and to make charges for the use thereof; and for any of such purposes to own, hold, lease and/or operate real or personal property." R. S. 32:1–7. By 1939 traffic congestion and mounting freight handling costs became acute and as a result the Port Authority authorized joint studies with motor truck operators as to the advisability of the construction of union motor truck terminals, and in 1941 a report was submitted to the Port Authority. The report concluded that terminal delivery of freight in the Port Authority district was a public problem because of street congestion and excessive costs; that existing motor truck terminals were inadequate and their operations uncoordinated. After a public hearing the Legislatures of New Jersey and New York passed statutes for financing and construction of union motor truck terminals. Following this, Inland Terminal No. 1 was constructed in New York and in 1948 the cornerstone of Inland Terminal No. 3 was laid, the construction cost to amount of $8,000,000. The essential feature of the plan for Inland Terminal No. 3 was to provide for loading and unloading of the large over-the-road trucks at one side of the terminal platform and the transshipment of the cargoes to and from small delivery trucks on the other side of the platform, the purpose being to replace the huge over-the-road trucks in the congested metropolitan area by smaller local delivery trucks. In September 1948 Newark Local 478 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers inserted a clause in the standard union contract which was then under negotiation with over-the-road carriers and local

cartage companies prohibiting the over-the-road carriers operating under a Local 478 contract from transferring, without the union's permission, more than 5,000 pounds of freight daily to local cartage companies. So long as this clause was a part of the contract between Local 478 and the carriers and cartage companies, the terminal could not be operated for the purpose intended. The Port Authority and the Mayor of Newark endeavored to eliminate this limitation or to waive its application in the case of the truck terminal, but without success. Efforts through the executive board of the International were made with the result that the executive board condemned the limitation, but nonetheless Local 478 refused to relax the requirement and it is and has been in each renewal of Local 478's contracts.

In 1950 the then Mayor of Newark wrote the Port Authority a letter in which he said:

"I urge the Authority to lease the idle truck terminal to a defense industry. Regrettably, because all real property under the Authority's control is tax-exempt and lessees of this property profit from that very peculiar advantage, fairness dictates that any industrial tenant of the terminal must be in a field that does not compete with existing industries in Newark.
\* \* \* Conversion of the idle terminal, while it will do little or nothing to help our ratables situation because of the Authority's exemption from real estate taxes, would at least benefit purchasing power in the community."

On November 1, 1950 the Port Authority, the City of Newark and the County of Essex entered into a written agreement under the "in-lieu-of-tax" statute under which the Authority agreed to make the maximum payments permitted by the statute, and the city in turn undertook to mark the properties tax exempt on its books.

On March 14, 1951, after extended negotiations, the motor truck terminal was leased to the Air Force at an annual rental of $421,754, a rental based upon the approximate debt service and fixed charges on the facility. The lease was for a period of four years, to expire June 30, 1955, and there was a 90-day termination option given the government.

The evidence establishes beyond question that Inland Terminal No. 3 was built to be operated as a freight terminal for transshipment from over-the-road to local carriers; that the Port Authority has never abandoned that purpose but, faced with the impossibility of devoting it to that use because of the insistence of Local 478 on the 5,000 pound limitation, it, in the exercise of sound business judgment, entered into the lease with the Air Force and it has every intention to use the building for its original purpose as soon as the impediment to such use is removed.

The city argues that there exists no specific statute exempting motor truck terminals from taxation. That argument loses sight of the specific language of *R. S.* 32:1–144 (*Chapter* 69, *Laws of* 1931), popularly known as the "in-lieu-of-tax" statute.

"To the end that * * * cities * * * may not suffer undue loss of taxes and assessments by reason of the acquisition and ownership of property therein by the Port of New York Authority (hereinafter called the port authority), the port authority is hereby authorized and empowered, in its discretion, to enter into a voluntary agreement or agreements with any * * * city * * * in said port district, whereby it will undertake to pay a fair and reasonable sum or sums annually in connection with any marine or inland terminal property owned by it, not in excess of the sum last paid as taxes upon such property prior to the time of its acquisition by the port authority."

When one notes that the statute uses the words "in connection with any marine or inland terminal property owned by it," it is obvious that the Legislature had in mind just such a situation as is here present. The statute above quoted is identical with *chapter* 553, *Laws of* 1931 of New York, *McKinney's Unconsol. Laws,* § 6551 *et seq.,* which has been before the courts of that State.

In *Bush Terminal Co. v. City of New York,* 152 *Misc.* 144, 273 *N. Y. S.* 331 (*Sup. Ct.* 1934), affirmed 256 *App. Div.* 978, 11 *N. Y. S.* 2d 554 (*App. Div.* 1939), affirmed 282 *N. Y.* 306, 26 *N. E.* 2d 269, 276 (1940) the New York Court of Appeals had occasion to consider the companion statute in New York, *chapter* 553, *Laws of* 1931. That court said that

the fact that the Legislatures of both states regarded the property of the Port Authority as immune from taxation is confirmed by the very language of *chapter* 553 of the *New York Laws of* 1931 and of *chapter* 69 of the *New Jersey Laws of* 1931. It said:

"There can be no doubt that the Legislatures of the two States, in unequivocal language, have manifested an intention that at least where such an agreement is made the property shall be exempt. The court must give effect to the legislative intent so manifested."

The opinion of the New York Court of Appeals concluded with this statement:

"Property held by an agency of the State is ordinarily immune from taxation only while it is used for a public purpose. Property used primarily to obtain revenue or profit is not held for a public use and is not ordinarily immune from taxation, but property held by a State agency primarily for a public use does not lose immunity because the State agency incidentally derives income from the property."

The Port Authority argues that the *Bush* case is dispositive of the matter under consideration, but while it is persuasive it is not dispositive because of a real difference in the factual situation. In the *Bush* case, the court was dealing with Inland Terminal No. 1 in the City of New York which was actually in use as a terminal facility although the upper floors were rented for warehouse, manufacturing and office uses. Inland Terminal No. 3 is not presently in use as an "inland terminal" but is under lease to the Air Force in its entirety. The Port Authority argues forcibly, if not persuasively, that the use of the property in connection with overseas military shipments to NATO and our allies is the highest type of public use. Granted the importance of the function which the Air Force is performing, it cannot be said to come within the meaning of "inland terminal" as used in *R. S.* 32:1–144. The city urges that the "in-lieu-of-tax" statute is unconstitutional because the exemption impliedly granted by that statute is based solely upon the acquisition and ownership of the property by the Port Authority. It

cites *New Jersey Turnpike Authority. v. Washington Township,* 16 *N. J.* 38 (1954), more particularly the following from the opinion:

"Moreover, tax exemption statutes, if based on the personal status of the owner rather than on the use to which the property is put, run afoul of the tax article of the Constitution of 1947 which provides in part: 'Property shall be assessed for taxation under general laws and by uniform rules.' *Const., Art.* VIII, *Sec.* I, *par.* 1."

The question before the court in *New Jersey Turnpike Authority v. Washington Township, supra,* as stated in the opinion was "whether or not the Turnpike Authority has an unlimited right to tax exemption, including even such property as is not used as part of the turnpike project." The court found the fact to be "that there is no likelihood of their (the lands which the Turnpike Authority claimed to be tax exempt) being used in the future for turnpike purposes. On the contrary, it is the announced intention of the Turnpike Authority to dispose of them as surplus property as soon as it conveniently can." The above cited case is not applicable because the Port Authority intends to devote the property to use as a union truck terminal at the termination of the Air Force lease. This is established by numerous facts in the record and testimony. More specifically, the public announcement by the Port Authority to that effect, the lease provisions with respect to safeguarding the operational equipment needed for union terminal operation, the statements to that effect in the annual reports to the Executive and Legislature, and the compelling fact that the Port Authority has directed its Committee on Operations to negotiate with trucking companies looking toward operation as a union truck terminal upon expiration of the Air Force lease in June, 1955. The above case also held that if the statutory exemption given to "property acquired or used," *R. S.* 27:23–12, by the Turnpike Authority was constitutional, then "property acquired or used" must be construed to mean "acquired and used." Having done that the court went on to say:

"It applies to property acquired for turnpike purposes and, having been so acquired, used for such purposes, *or held with the present design to devote it, within a reasonable length of time to such use.*" (Italics mine.)

The court finds that the Port Authority is holding the property in dispute with the present design to devote it within a reasonable time to a public use, *i. e.*, a union truck terminal; that it has never departed from that design; that the period from March 14, 1951 when the Air Force lease was executed until the expiration date in June 1955 is a reasonable length of time in view of all of the circumstances.

The other points urged by the city in support of its right to tax the terminal property have been examined and found devoid of merit. Furthermore, the interesting question of whether the city may now attack *R. S.* 32:1–144, the "in-lieu-of-tax" statute after it has accepted the benefits thereof, need not be discussed or passed upon.

The judgment of the court is that the tax assessments by the City of Newark for the years 1952 and 1953 on the Newark Motor Truck Terminal are set aside.