**BROOKLYN BRIDGE PARK COALITION, Plaintiff,**

v.

**PORT AUTHORITY OF NEW YORK AND NEW JERSEY and The Strober Organization, Defendants.**

No. 96 CV 3793 (RR).

United States District Court, E.D. New York.

Jan. 14, 1997.

---

Cravath Swaine & Moore by Francis P. Barron, New York City, for Plaintiff.

Sills Cummis Zuckerman Radin Tischman Epstein & Gross by Mark S. Olinsky, Mark E. Duckstein, New York City, for Defendant Strober Organization.

Milton H. Pachtler, The Port Authority of New York and New Jersey, by Walter M. Frank, Timothy G. Stickelman, New York City, for Defendant Port Authority.

Richard Goldberg, Brooklyn, NY, for Amici Curiae.

Zachary W. Carter, United States Attorney by Stanley Alpert, Assistant United States Attorney, Brooklyn, NY, for the United States as Amicus Curiae.

## MEMORANDUM AND ORDER

RAGGI, District Judge:

Plaintiff Brooklyn Bridge Park Coalition ("the Coalition"), a not-for-profit corporation comprised of approximately sixty civic associations, brings this action to challenge the decision of the Port Authority of New York and New Jersey ("the Port Authority") to lease Pier 3, a pier and warehouse located on the Brooklyn waterfront, to the Strober Organization ("Strober") for use as a building supply facility and corporate headquarters. The Coalition seeks declaratory and injunctive relief, specifically: (1) a declaration that the Port Authority is a "federal agency," which must comply with provisions of the National Environmental Protection Act ("NEPA"), 42 U.S.C. §§ 4321–70 (1994), and the Coastal Zone Management Act ("CZMA"), 16 U.S.C. §§ 1451–64 (1994), before leasing Pier 3 to Strober; (2) a declaration that the Port Authority is a "state agency," which must comply with provisions of New York's State Environmental Quality Review Act, N.Y.Envtl.Conserv.Law §§ 8–0101–8–0117 (McKinney 1984 & Supp.1996), and Waterfront Revitalization Act, N.Y.Exec. Law §§ 910–923 (McKinney 1996), before leasing Pier 3 to Strober; (3) a declaration that the Port Authority acted *ultra vires* its founding compact in leasing Pier 3 to Strober; (4) an injunction barring the Port Authority from honoring the Strober lease; and (5) an injunction barring Strober from constructing a building supply facility on Pier 3 that will create a public nuisance.

Defendants move for dismissal of all claims. The Coalition cross-moves for summary judgment on its *ultra vires* claim. Having carefully reviewed the papers submitted by the parties,[1] and having heard oral

---

1. In addition to the parties' papers, the court has reviewed a brief in opposition to dismissal filed by *amici curiae* New York State Senator Martin

Connor; New York State Assembly member Eileen Dugan; United States Representatives Edolphus Towns, Jerrold Nadler, and Nydia Ve-

argument on October 2, 1996, the court denies plaintiff's motion for partial summary judgment and grants defendants' motion to dismiss all federal claims for failure to state a claim upon which relief can be granted. Plaintiff's state law claims against the Port Authority and Strober are dismissed for lack of independent federal jurisdiction.

### Factual Background

#### 1. The Parties and the Strober Lease

Plaintiff Coalition was organized in 1989 and has as its members sixty civic organizations and community groups from the downtown waterfront area of Brooklyn. Its stated mission is the creation of a multi-use recreational facility on the Brooklyn Heights waterfront. Defendant Strober is a construction supply company whose headquarters and main warehouse had been located on Hamilton Avenue in Brooklyn. Defendant Port Authority owns and operates a series of piers on the Brooklyn waterfront as part of the Brooklyn Port Authority Marine Terminal ("Brooklyn Marine Terminal"). Several of these piers are currently used as active shipping terminals; others stand vacant.

The Brooklyn Marine Terminal apparently operates at a deficit. To raise revenue, the Port Authority, on March 29, 1996, preliminarily decided to lease one of its vacant Brooklyn piers, known as Pier 3, to Strober for use as its headquarters and warehouse. The lease was formally approved by the Port Authority's Board of Directors on June 6, 1996. Strober's lease at its Hamilton Avenue facility expired on December 31, 1996. It plans to occupy the Pier 3 site as soon as practicable.

#### 2. The Port Authority

Since many of the legal issues in this case hinge on the structure and power of the Port Authority, the court briefly discusses the creation of this entity.

New York and New Jersey have a long history of cooperation regarding their shared port. For example, in 1834, the two states

lazquez; and New York City Council members Kenneth Fisher, Stephen Dibrienza, and Joan

entered into "an agreement fixing and determining the rights and obligations of the two States" with respect to the "bay of New York and the Hudson River." See 42 Stat. 174 (1921). As commerce in the port expanded, the states' legislatures, in 1917, authorized their respective governors to appoint members to a "New York, New Jersey Port and Harbor Development Commission," for the purpose of studying and making recommendations concerning the operation of the common port. See Bush Terminal Co. v. City of New York, 152 Misc. 144, 147, 273 N.Y.S. 331, 335 (N.Y.Co.1934) (detailing history of the Port Authority), aff'd, 256 App.Div. 978, 11 N.Y.S.2d 554 (1st Dep't 1939), aff'd, 282 N.Y. 306, 26 N.E.2d 269 (1940). The end result was an interstate compact signed on April 20, 1921 and ratified by Congress on August 23, 1921, creating the Port Authority. Id. at 149, 273 N.Y.S. at 337.

In giving its consent to this compact, Congress acknowledged that the waterways common to the two states had "become commercially one center or district." 42 Stat. 174. It recognized that "better coordination of the terminal, transportation, and other facilities of commerce in, about, and through the port of New York will result in great economies, benefiting the Nation as well as the States of New York and New Jersey." Id. It concluded that these ends could best be attained "through the cooperation of the two States by and through a joint or common agency." Id.

By the terms of the compact, the Port Authority is defined as "a body corporate and politic, having the powers and jurisdiction hereinafter enumerated, and such other and additional powers as shall be conferred upon it by the legislature of either State concurred in by the legislature of the other, or by Act or Acts of Congress...." Id. at Art. 3. The enumerated powers are broad. They include

full power and authority to purchase, construct, lease, and/or operate any kind of terminal or transportation facility [in the port] district; and to make charges for the

Griffin McCabe.

use thereof; and for any of such purposes to own, hold, lease, and/or operate real or personal property, to borrow money and secure the same by bonds or by mortgages upon any property held or to be held by it.

*Id.* at Art. 6. The compact further provides for the Port Authority to "have such additional powers and duties as may hereafter be delegated to or imposed upon it from time to time by the action of the legislature of either State concurred in by the legislature of the other." *Id.* at Art. 7.

With respect to fiscal matters, " '[t]he Port Authority was conceived as a financially independent entity, with funds primarily derived from private investors.' " *Hess v. Port Authority Trans–Hudson Corp.,* 513 U.S. 30, 36, 115 S.Ct. 394, 398, 130 L.Ed.2d 245 (1994) (quoting *United States Trust Co. of N.Y. v. New Jersey,* 431 U.S. 1, 4, 97 S.Ct. 1505, 1508–09, 52 L.Ed.2d 92 (1977)). Any debts or obligations incurred by the Port Authority "are not liabilities of the two founding States, and the States do not appropriate funds to the Authority." *Id.* at 37, 115 S.Ct. at 399. Neither does Congress appropriate funds to the Port Authority. "Tolls, fees, and investment income account for the Authority's secure financial position." *Id.*

### Discussion

#### I. *Motion to Dismiss*

In considering a motion to dismiss, a court must assume that all factual allegations in a plaintiff's complaint are true. It must also draw all reasonable inferences in plaintiff's favor. *See Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 164, 113 S.Ct. 1160, 1161, 122 L.Ed.2d 517 (1993). Dismissal is warranted only if it appears beyond question that plaintiff can prove no set of facts to support its claim. *E.g., Bernheim v. Litt,* 79 F.3d 318, 321 (2d Cir.1996) (and cases cited therein). Applying these principles to this case, the court is persuaded that plaintiff's federal claims must be dismissed for failure to state a claim upon which relief can be granted.

#### II. *The Ultra Vires Claim Against the Port Authority*

The Coalition asserts that the Port Authority's decision to lease Pier 3 to Strober for use as its corporate headquarters and supply facility is not authorized by the governing federal compact and should, therefore, be enjoined. Defendants move for dismissal of this claim on both procedural and substantive grounds. The court rejects defendants' procedural challenge but agrees that this claim must be dismissed on substantive grounds.

#### A. *The Procedural Challenge*

■ Defendants submit that only the Attorneys General of New York or New Jersey may sue to enjoin the Port Authority from pursuing any course of conduct. Thus, to the extent plaintiff seeks to enjoin the Port Authority from leasing Pier 3 to Strober, its complaint must be dismissed.

Defendants' argument derives from state law. Prior to 1950, New York courts consistently held that the Port Authority, as an agency of the states of New York and New Jersey, enjoyed complete sovereign immunity from suits of any sort in the courts of those states. *See, e.g., Trippe v. Port of New York Authority,* 14 N.Y.2d 119, 123, 249 N.Y.S.2d 409, 411, 198 N.E.2d 585, 586–87 (1964). In 1950, the legislatures of the two states each enacted statutes consenting to suit against the Port Authority. *See* N.Y.Unconsol.Law § 7101 (McKinney 1979) (subjecting Port Authority to "suit, actions or proceedings of any form or nature at law, in equity or otherwise").[2] The waiver of sovereign immunity was not, however, unconditional. It did "not extend to suits, actions or proceedings for judgments, orders or decrees restraining, enjoining or preventing the port authority from committing or continuing to commit any act or acts" except when brought "by the attorney general of New York or by

---

2. Where the two states have enacted parallel legislation, this court follows the precedent established by *Automobile Club of New York, Inc. v. Cox,* 592 F.2d 658, 661 n. 4 (2d Cir.1979); *accord Automobile Club of New York, Inc. v. Port Authority of New York and New Jersey,* 887 F.2d 417, 418 n. 1 (2d Cir.1989), and cites only to the New York statute.

the attorney general of New Jersey." N.Y.Unconsol.Law § 7105 (McKinney 1979).

■ Whatever effect these statutes have on actions against the Port Authority in state court, they simply do not apply to federal claims in this court. In *Hess v. Port Authority Trans–Hudson Corp.*, 513 U.S. 30, 115 S.Ct. 394, 130 L.Ed.2d 245 (1994), the Supreme Court expressly held that the Port Authority does not enjoy sovereign immunity from suit in federal courts on questions of federal law. The *Hess* ruling controls this case. The Coalition is, after all, suing to enjoin the Port Authority from acting *ultra vires* its compact in leasing Pier 3 to Strober. Resolution of this claim necessarily requires a court to construe the compact creating the Port Authority. The construction of interstate compacts approved by Congress pursuant to the Constitution's Compact Clause, Art. I, § 10, cl. 3,[3] "presents a federal question." *Cuyler v. Adams*, 449 U.S. 433, 438, 101 S.Ct. 703, 707, 66 L.Ed.2d 641 (1981).[4] This is because "congressional consent transforms an interstate compact within this Clause into a law of the United States." *Id.; see Petty v. Tennessee–Missouri Bridge Comm'n*, 359 U.S. 275, 278–79, 79 S.Ct. 785, 788–89, 3 L.Ed.2d 804 (1959) (when a dispute arises over the meaning of an interstate compact, "the Court is called on to interpret not unilateral state action but the terms of a consensual agreement, the meaning of which, because made by different States acting under the Constitution and with congressional approval, is a question of federal law").

Because the Coalition's *ultra vires* challenge to the Strober lease presents a federal question regarding the Port Authority compact, the court must reject defendants' procedural attack on plaintiff's standing to seek an injunction on this claim.

**3.** The Compact Clause provides that "No State shall, without the Consent of the Congress, ... enter into any Agreement or Compact with another State...."

**4.** No party suggests that the Port Authority compact was not approved pursuant to the Compact Clause. Indeed, in *Hess*, the Supreme Court noted that "[t]he Port Authority of New York and

### B. *The Substantive Challenge*

■ Plaintiff submits that, because Strober intends to use the Pier 3 site as an office and warehouse, and not as a "marine terminal facility" for the offloading of goods delivered by ship to the site, the Port Authority would be acting *ultra vires* the powers conferred upon the agency by its compact in leasing the property to this codefendant. Defendants contend that this claim must be rejected as a matter of law. The court agrees.

■ Interpretation of the compact necessarily begins with its language. *See, e.g., United States v. Kinzler*, 55 F.3d 70, 72 (2d Cir.1995) (and cases cited therein); *accord* 2A Norman Singer, *Sutherland Stat. Const.* § 46.01 (5th ed. 1992) (the meaning of a statute must be sought first in its language). Indeed, "it is the task of judges to start with the language of a statute and to reach a judgment that applies that language to a particular set of circumstances in a manner consistent with the statute's stated objectives." *Korea Shipping Corp. v. New York Shipping Assoc.—Int'l Longshoremen's Assoc. Pension Trust Fund*, 880 F.2d 1531, 1537 (2d Cir.1989). Common sense is essential to the endeavor, for literal applications that lead to absurd results must be avoided. *See United States v. McKeithen*, 822 F.2d 310, 315 (2d Cir.1987); *Sutherland Stat. Const.* § 45.07. Thus, disputed sections cannot always be parsed in isolation. Rather, they must be reviewed in light of the "general purpose and intent" of the legislation. *Id.* at § 46.05.

Since its earliest enactment, the compact has vested the Port Authority "with full power and authority to purchase, construct, lease, and/or operate any terminal or transportation facility within said district; and *to make charges for the use thereof;* and for any of such purposes to own, hold, lease,

New Jersey exemplifies both the need for, and the utility of, Compact Clause entities." 513 U.S. at ——, 115 S.Ct. at 401 (citing Frankfurter & Landis, The Compact Clause of the Constitution—A Study in Interstate Adjustments, 34 Yale L.J. 685, 697 (1925) (discussing history of Port Authority)).

and/or operate real or personal property...." 42 Stat. 174, Art. 6 (emphasis added). The language is expansive rather than limiting, and plainly permits the Port Authority to charge private parties—such as Strober—for the unqualified "use" of any terminal or transportation facility.

The compact defines "terminal facility" in a similarly expansive rather than limiting manner. Article 22 provides that the term "terminal facility"

> shall include wharves, *piers*, slips, ferries, docks, dry docks, bulkheads, dock walls, basins, car floats, float bridges, grain or other storage elevators, *warehouses*, cold storage, tracks, yards, sheds, switches, connections, overhead appliances, and every kind of terminal or storage facility now in use or hereafter designed for use for the handling, storage, loading, or unloading of freight at steamship, railroad, or freight terminals.

(Emphasis added.) "Facility"

> shall include all works, buildings, structures, appliances, and appurtenances necessary and convenient for the proper construction, equipment, maintenance, and operation of such facility or facilities, or any one or more of them.

There is no question that Pier 3, one of a series of contiguous piers on the Brooklyn waterfront, and the warehouse located thereon, fall squarely within the compact's definition of terminal facility. Thus the court need look no further than the broad empowering language of the original compact to uphold the Port Authority's proposed lease of Pier 3 to Strober. "[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253–54, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992) (citations omitted). Indeed, "[w]hen the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'" *Id.* at 254, 112 S.Ct. at 1149 (quoting *Rubin v. United States*, 449 U.S. 424, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981)).

Plaintiff nevertheless urges a narrower interpretation of the Port Authority's lease powers. It insists that Article 6 only empowers the Port Authority to lease terminal facilities to third parties when the lessees themselves intend to use the sites for marine terminal purposes. Since Strober does not expect to use Pier 3 to load or unload marine freight, but rather will renovate and use the existing warehouse mostly to store goods that are transported over land to the site, plaintiff submits that the lease is *ultra vires* the compact.

In support of this argument, plaintiff relies on the original compact. It submits (1) that under Article 6, the Port Authority can only charge for the use of terminal or transportation facilities, and (2) that for any property to qualify as a terminal facility, it must satisfy the final clause of the Article 22 definition, *i.e.*, it must be a facility "now in use or hereafter designed for use for the handling, storage, loading or unloading of freight at steamship, railroad, or freight terminals." Accordingly, plaintiff argues, since Pier 3 is not *now* in such use, and since Strober does not propose *hereafter* to put it to such use, the proposed lease is *ultra vires* the compact. While this court agrees with plaintiff's reading of Article 6, it cannot adopt its construction of Article 22.

The final clause of Article 22 does not modify all terms in the compact's list of terminal facilities. Rather, the final clause opens with the word "and" to add to the specific items identified as such facilities "every kind of terminal or storage facility now in use or hereafter designed for use for the handling, storage, loading, or unloading of freight at steamship, railroad, or freight terminals." Thus, the final clause is a catch-all description of facilities that, because of their present use or future intended use, would constitute terminal facilities regardless of whether specifically enumerated in the preceding list. This interpretation is consistent with the drafters' use of the word "include" at the start of the definition of terminal facility. "Include" is properly understood as a term enlarging rather than limiting a definition. *See Sutherland Stat. Const.* § 47.07. In any event, a qualifying phrase such as the final clause in Article 22 is properly read to refer only to the words that directly precede

it. *See Wilshire Westwood Assoc. v. Atlantic Richfield Corp.*, 881 F.2d 801, 804 (9th Cir. 1989); *Sutherland Stat. Const.* § 47.33 ("[r]eferential and qualifying phrases, where no contrary intention appears, refer solely to the last antecedent"). Only when the qualifying clause is itself set off by a comma—which is not the case with the language at issue in Article 6—is it understood to apply to an entire preceding series. *See Elliot Coal Mining Co. v. Director, Office of Workers' Compensation Programs*, 17 F.3d 616, 629 (3d Cir.1994) (presence of comma before the last clause in a statute. suggests that limiting clause applies to entire preceding series); *Sutherland Stat. Const.* § 47.33 (same).

The Coalition argues that unless the final phrase of Article 22 is interpreted to modify each structure described in the preceding list, the definition of terminal facility would be boundless: any "shed" owned by the Port Authority would qualify as a terminal facility regardless of is location and use. In fact, the concern is unwarranted. The structures specifically listed in Article 22 are presumptively terminal facilities. This is not altered by the fact that an imaginative party may hypothesize situations where a "shed" or "warehouse" or "dock" could be totally unrelated to the flow of commerce in the port district. Courts well understand Judge Learned Hand's caution that, although the words of a statute must generally be given their plain meaning, the dictionary does not become a "fortress" supporting conclusions totally at odds with legislative objectives. *Cabell v. Markham*, 148 F.2d 737, 739 (2d Cir.), *aff'd*, 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945); *accord Lewis v. Grinker*, 965 F.2d 1206, 1215 (2d Cir.1992); *Korea Shipping Corp. v. New York Shipping Assoc.—Int'l Longshoremen's Assoc. Pension Trust Fund*, 880 F.2d at 1537. Precisely because the Port

Authority's mandate is so broad, however, a court would have to look carefully at the totality of circumstances before concluding that a statutorily identified structure should not be treated as a terminal facility. Such an inquiry would not, however, be limited to the present and future use of the structure, which is the focus of the final phrase of Article 22. This expansive (rather than limiting) clause recognizes that literally any property or structure may qualify as a terminal facility provided it is being used or will be used in conjunction with a ship or freight terminal. But when dealing with the structures specifically identified as terminal facilities in the compact, a court would have to look to the historic use of the property, as well as its present and future intended use, before concluding that it did not come within the statutory scheme. In this case, it is beyond question that the entire Brooklyn waterfront, including Pier 3 and the warehouse on it, have historically operated as important terminal facilities. The Strober lease will not radically alter the character of this property. Indeed, it will remain essentially "designed" as a pier and warehouse suitable for the unloading of freight at the waterfront. Thus, the court finds that Article 6 fully empowers the Port Authority to charge for the use of this facility without regard to the fact that Strober may not use it to receive or store goods received at the pier.

Plaintiff also relies on certain amendments to the original compact in support of its *ultra vires* claim. Specifically, it points to a 1947 amendment authorizing the Port Authority to acquire property in New York and New Jersey through condemnation or eminent domain as "necessary, convenient or desirable for marine terminal purposes." *See* N.Y.Unconsol.Law § 6671 (McKinney 1979).[5] In the 1947 version of the law, "marine terminal purposes" is defined as "the effectuation, es-

---

**5.** Neither the 1947 amendments, nor those enacted in 1984, discussed *infra*, were submitted to or approved by Congress. Nevertheless, Congress did authorize New York and New Jersey jointly to delegate additional powers and duties to the Port Authority. 42 Stat. 174, Art. 7; *see Hess v. Port Authority Trans–Hudson Corp*, 513 U.S. at ——, 115 S.Ct. at 399 ("Acting jointly, the state legislatures may augment the powers and responsibilities of the Port Authority"); *Courtesy*

*Sandwich Shop, Inc. v. Port of New York Authority*, 12 N.Y.2d 379, 391, 240 N.Y.S.2d 1, 7, 190 N.E.2d 402 (1963) (the original compact expressly contemplated further co-operative legislation in furtherance of port purposes). The Port Authority thus conceded at oral argument that amendments, no less than the original compact, are properly viewed as federal law. (Transcript, Oct. 2, 1996, p. 10).

tablishment, acquisition, construction, rehabilitation, improvement, maintenance or co-operation of marine terminals." *Id.* at § 6673.

"Marine terminals"

shall mean developments, consisting of one or more piers, wharves, docks, bulkheads, slips, basins, vehicular roadways, railroad connections, side tracks, sidings or other buildings, structures, facilities or improvements, necessary or convenient to the accommodation of steamships or other vessels and their cargoes or passengers.

*Id.*[6]

In the 1984 amendments, this definition of marine terminals was expanded to include "waterfront development projects," which were defined as "projects for the revitalization and economic development of waterfront property which is (i) not used for the handling of water-borne cargoes, or (ii) directly or indirectly related to the water-borne movement of passengers and their vehicles. . . ." *Id.* at § 6673 (Supp.1996). Only two such projects were specifically authorized in the legislation, one in Hoboken, New Jersey, 1984 N.Y.Laws ch. 677, § 4(a), the other at Hunter's Point in Queens, New York, *id.* at § 4(b). Any further waterfront projects were made subject to specific local and state approval. *Id.* at § 5.

Plaintiff argues that the Strober lease will not serve a "marine terminal purpose" as defined by these statutory amendments to the compact. It further submits that the amendments are the sole source of Port Authority power for the conversion of inactive terminals to some other purpose. The court must reject both arguments.

Section 6671 was not enacted to clarify, much less limit, the broad empowerment of the Port Authority to charge for the use of established terminal facilities set forth in Article 6 of the original compact. Rather, it was enacted to supplement the Port Authority's existing powers by permitting the agency to acquire land by condemnation or eminent domain so long as that acquisition was for marine terminal purposes. This case is not concerned with the Port Authority's acquisition of new property. Rather, its singular focus is on the agency's ability to lease a long-established terminal facility. The New York legislature made clear that the 1947 amendments were "supplementary to" the original compact, and "not in limitation or derogation of any of the powers heretofore conferred upon or delegated to the Port Authority." N.Y.Unconsol.Law § 6675. Thus, it is Article 6 of the original compact that controls.

Similarly, the "waterfront development" amendments cannot be viewed as limitations on the Port Authority's power to charge for the use of already established piers and warehouses such as Pier 3. Rather, this expansion of the definition of "marine terminal facility" was intended to permit the Port Authority to become involved in the financing and development of large-scale waterfront projects totally unrelated to traditional terminal facilities. These could include hotels, marinas, commercial office buildings, as well as conference, convention, recreation, and entertainment facilities. *See* 1984 N.Y.Laws ch. 676, § 1(b). Such development is not the purpose of the Strober lease. The Port Authority is simply charging Strober for the use of an existing and traditional terminal facility comprised of a pier and warehouse. Although Strober may not use the pier to handle marine freight and although it may renovate the warehouse, it is important to note that it will not transform the property into something other than a terminal facility. Under such circumstances, the special requirement provisions applicable to waterfront development projects simply do not pertain.

Plaintiff's *ultra vires* claim is no more supported by common sense than it is by the plain language of the Port Authority compact. According to the Coalition, however long a piece of property may have operated as a terminal facility, once it ceases to be used for the handling of freight at a steamship, railroad, or freight terminal, the Port

---

**6.** The court notes that the limiting clause in section 6673—"necessary or convenient to the accommodation of steamships or other vessels and their cargoes or passengers"—differs from that in Article 22, discussed *supra*, in that it is separated from the enumerated list by a comma. Thus, it is properly read to modify each item in the list. For the reasons discussed *infra*, this does not add any support to plaintiff's *ultra vires* claim.

Authority loses any power to derive revenue from the site except by selling it. Thus, in the instant case, plaintiff would permit the Port Authority only two options: sell Pier 3 or let it lie fallow. This is not sensible. It precludes the Port Authority from engaging in flexible long-term management of the district's waterfront. The flow of commerce through the district is by no means constant. Piers that were active in the past may not be needed today. But in the future, demand may increase. The Port Authority must be permitted reasonably to husband its terminal resources against the prospect of future need. One obvious course is to lease unused piers and warehouses for discrete periods to entities that, whatever use they may make of the sites, will nevertheless not radically alter their basic character as terminal facilities.

This conclusion is consistent with the over-all liberal grant of discretion to the Port Authority that is reflected in the original compact and subsequent amendments. Indeed, in the comprehensive plan for port development adopted by New York and New Jersey in 1922, the year following Congress's approval of the original compact,[7] the two states empowered the Port Authority to unify the district's terminal operations so as to provide for suitable markets, stations, and warehouses; to consolidate shipping; to direct freight to avoid congestion; to coordinate existing facilities; and to provide for adequate tunnel and bridge connections. 1922 Laws N.Y. ch. 43, § 4. Toward this end, the states conferred upon the Port Authority "all necessary and appropriate powers not inconsistent with the constitution of the United States or of either state, to effectuate the same, except the power to levy taxes or assessments." Id. at § 8.

Further, in the landmark decision Bush Terminal Co. v. City of New York, 282 N.Y. 306, 26 N.E.2d 269 (1940), the New York Court of Appeals recognized the broad dis-cretion enjoyed by the Port Authority in carrying out its mandate. At issue in that case was the Port Authority's construction of a railroad terminal station with some sixteen upper stories built for the express purpose of generating revenue by leasing the space to industrial and manufacturing tenants. Rejecting an *ultra vires* challenge to the agency's actions, the court ruled that the "test" in reviewing Port Authority action not directly linked to terminal purposes was necessarily one "of degree." Id. at 316, 26 N.E.2d 269. In *Bush Terminal*, it would have been economically impossible to construct the new railroad station without the income-generating upper stories. Id. at 315, 26 N.E.2d 269. So in this case, it appears undisputed that the Port Authority presently operates the piers along the Brooklyn waterfront at a loss. The agency has decided that it is not yet time to abandon these important piers. The decision to maintain the availability of the Brooklyn waterfront as a terminal facility but to offset present losses by temporarily leasing unused piers and warehouses to commercial clients is a reasonable decision by the agency consistent with the broad grant of discretionary power conferred by Congress and the founding states.[8]

Plaintiff's *ultra vires* challenge to the Strober lease is, therefore, dismissed as a matter of law.

### III. Federal Environmental Protection Statutes

■ The Coalition asks this court to declare the Port Authority a "federal agency," which must comply with both NEPA and CZMA before leasing Pier 3 to Strober. NEPA requires "all agencies of the Federal Government" proposing a "major Federal action[ ] significantly affecting the quality of the human environment" to prepare an environmental impact statement or assessment. 42 U.S.C. § 4332(2)(C). This has not been

---

7. Pursuant to Article 11 of the compact, such plans are "binding upon both States with the same force and effect as if incorporated in" the original compact.

8. Since the Strober lease will not alter the property's basic character as a terminal facility, this court is not presented with the more difficult case hypothesized by plaintiff of converting a pier into a shopping mall. This court concurs with the holding of *Bush Terminal* that the "degree" of alteration from a terminal facility is a factor to be weighed in assessing a challenge to the Port Authority's exercise of its Article 6 powers.

done in connection with the proposed lease of Pier 3 to Strober. CZMA requires a "Federal agency activity" that affects a coastal zone to be carried out in a manner consistent with "approved state management programs." 16 U.S.C. § 1456(c)(1)(A). Plaintiff submits that the Port Authority has failed to ensure that the Strober lease of Pier 3 would be consistent with New York State's Waterfront Revitalization Plan.[9] Defendants move for dismissal of these claims on the grounds that the Port Authority is not a "federal agency" within the meaning of either of these federal statutes. This court agrees.

On its face, NEPA applies only to "agencies of the Federal Government." 42 U.S.C. § 4332(2). While the statute does not define what qualifies as a "federal agency," guidance is provided in the accompanying regulations:

> "Federal agency" means all agencies of the Federal Government. It does not mean the Congress, the Judiciary, or the President, including the performance of staff functions for the President in his Executive Office. It also includes for purposes of these regulations States and units of general local government and Indian tribes assuming NEPA responsibilities under section 104(h) of the Housing and Community Development Act of 1974.

40 C.F.R. § 1508.12 (1996).

The regulations pertaining to CZMA define "Federal agency" even more narrowly to mean "any department, agency, board, commission, council, independent office or similar entity within the executive branch of the Federal Government, or any wholly owned Federal Government corporation." 15 C.F.R. § 930.17 (1996).

This court holds that the Port Authority is not a federal agency under either statutory scheme. Plainly, the Port Authority is not "within the executive branch of the Federal Government," nor is it "a wholly owned Federal Government corporation," as provided in the regulations for CZMA. Neither is it properly viewed as an "agency of the Federal Government" for purposes of NEPA. The Federal Government plays no role in the operation of the Port Authority. The agency is governed by commissioners appointed by the states of New York and New Jersey, whose actions are subject to the veto of their respective governors. N.Y.Unconsol.Law §§ 6417, 7151–7154 (McKinney 1979). Neither Congress nor the President participates in the agency's decision making. The federal government provides the agency with no financial support.

 The Coalition nevertheless submits that the Port Authority should be treated as a federal agency because it was created with the approval of Congress under the Constitution's Compact Clause. This court is not persuaded. Compact Clause entities are hybrids, occupying a special position in the federal system. As the Supreme Court has observed, a Compact Clause entity is really the creation of multiple sovereigns: the compacting states whose actions are its genesis, and the federal government, whose approval is constitutionally required when the agency will operate in an area affecting the national interest. *See Hess v. Port Authority Trans–Hudson Corp.,* 513 U.S. at 38–39, 115 S.Ct. at 400–01 (citations omitted); *Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency,* 440 U.S. 391, 399, 99 S.Ct. 1171, 1176, 59 L.Ed.2d 401 (1979). While Congressional approval of a bistate compact makes it appropriate to treat the document's interpretation as a federal question, *see Cuyler v. Adams,* 449 U.S. at 440, 101 S.Ct. at 707–08, this "law of the Union" doctrine does not mean that Congress intends to subsume the Compact Clause agency within the federal government or to subject its operations to general federal regulatory schemes. Indeed, the Port Authority compact suggests the contrary. Congress specifically provided for the two founding states to amend the empowerment clauses of the Port Authority compact without further federal approval. 42 Stat. 174, Art. 7. Similarly, Congress contemplated that New York and New Jersey would formulate plans for the development of their common port district without consulting, much less seeking the approval

---

9. As noted at the outset of this memorandum, plaintiff alternatively contends that the Port Authority is a state agency directly subject to New York's Waterfront Revitalization Act.

of, the Federal Government. *Id.* at Art. 11. These states, not Congress, would be responsible for enforcement of Port Authority rules. *Id.* at Art. 19. Port Authority annual reports would be made to the states' legislatures with no copy demanded by Congress. *Id.* at Art. 7.

Despite the close association between the Port Authority and the states of New York and New Jersey, the Supreme Court has ruled that the agency does not share the Eleventh Amendment immunity of its founding states. *Hess v. Port Authority Trans–Hudson Corp.*, 513 U.S. at 51, 115 S.Ct. at 406. This ruling does not, however, support plaintiff's contention that the Port Authority is a federal agency. Indeed, if that had been the Supreme Court's view, the Eleventh Amendment claim in *Hess* could have been dismissed quite easily. Instead, the Court's analysis focused on the fact-specific test articulated in *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency* for determining when Compact Clause agencies are entitled to Eleventh Amendment immunity: "we . . . presume the Compact Clause agency does not qualify for Eleventh Amendment immunity '[u]nless there is good reason to believe that the States structured the new agency to enable it to enjoy the special constitutional protection of the States themselves, and that Congress concurred in that purpose.'" *Hess v. Port Authority Trans–Hudson Corp.*, 513 U.S. at 43–44, 115 S.Ct. at 402 (quoting *Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency*, 440 U.S. at 401, 99 S.Ct. at 1177). The Court proceeded to review numerous factors linking the Port Authority quite closely to its founding states. *Id.* at 403, 99 S.Ct. at 1178. Nevertheless, it concluded that the financial independence of the agency removed any "good reason" for concern about New York's or New Jersey's solvency and dignity, the factors that underpin the Eleventh Amendment. *Id.* at 406, 99 S.Ct. at 1179–80. There would simply have been no need to engage in this sort of balancing if the Port Authority were a federal agency.

Indeed, the Supreme Court denied Eleventh Amendment protection to another Compact Clause agency, the Tahoe Regional Planning Agency, in *Lake Country Estates v. Tahoe Regional Planning Agency*, 440 U.S. at 402, 99 S.Ct. at 1177–78, but in the same decision held that agency members were engaged in "state action" and, therefore subject to suit under 42 U.S.C. § 1983, *id.* at 399–400, 99 S.Ct. at 1176–77. Once again, such a ruling would not be consistent with any view of the Compact Clause entity as a "federal agency." Indeed, when *Lake Country Estates* was before the Ninth Circuit, that court, in a ruling not reviewed by the Supreme Court, upheld dismissal of the United States as a defendant in the lawsuit, in part on the ground that Congress's approval of a compact creating an interstate agency did not establish the entity as a federal agency. *See Jacobson v. Tahoe Reg'l Planning Agency*, 566 F.2d 1353, 1362 (9th Cir.1977), *rev'd on other grounds sub nom. Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency*, 440 U.S. 391, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979); *accord California Tahoe Reg'l Planning Agency v. Sahara Tahoe Corp.*, 504 F.Supp. 753, 763 (D.Nev.1980) (Tahoe Regional Planning Agency not a "federal agency" subject to NEPA); *California Dep't of Transp. v. City of South Lake Tahoe*, 466 F.Supp. 527, 536 (E.D.Cal.1978) (same). Thus, Supreme Court rulings denying Eleventh Amendment immunity to Compact Clause agencies provide no support for plaintiff's claim that these entities are "federal agencies."

 Mindful that NEPA and CZMA are laws routinely enforced by the Environmental Protection Agency ("EPA"), this court invited that agency to be heard on plaintiff's claim that the Port Authority is a "federal agency" subject to these statutes. At the October 2, 1996 oral argument on the parties' motions, Assistant United States Attorney Stanley Alpert appeared on behalf of the EPA and advised that "it's the EPA's view that the Port Authority is not a federal agency." (Transcript, Oct. 2, 1996, p. 16). An agency's views with respect to the statutes it enforces are entitled to substantial deference. *See Atlantic Legal Found. v. Eastman Kodak Co.*, 12 F.3d 353, 358 (2d Cir.1994) ("EPA's reasonable interpretations of [Clean Water] Act are due deferential treatment in the courts"), *cert. denied*, 513 U.S. 811, 115

S.Ct. 62, 130 L.Ed.2d 19 (1994); *accord Good Samaritan Hosp. Reg. Med. Ctr. v. Shalala,* 85 F.3d 1057, 1061–62 (2d Cir.1996) (Health and Human Services' construction of Medicare Act entitled to great deference). Thus, the court finds further support for its dismissal of these federal statutory claims in the opinion of this administrative agency.[10]

The claims for declaratory judgment based on non-compliance with NEPA and CZMA are dismissed.

## IV. *State Law Claims*

■ Having dismissed all of plaintiff's federal claims, this court no longer has any independent jurisdiction over state law claims against the Port Authority for non-compliance with New York's Waterfront Revitalization Act and State Environmental Quality Review Act. Neither does it have jurisdiction over plaintiff's nuisance claim against Strober. Although defendants have made strong arguments in favor of dismissal of even these claims, the court declines to exercise supplemental jurisdiction. *See United Mine Workers of America v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Choe v. Fordham Univ. Sch. of Law,* 81 F.3d 319 (2d Cir.1996). These claims, and the motions to dismiss them, involve issues of state public policy that, in the absence of federal jurisdiction, are best resolved by the state courts. The state claims are, therefore, dismissed without prejudice to refile in state court.

### Conclusion

For the reasons stated, the court dismisses plaintiff's request for declaratory judgment that the Port Authority would be acting *ultra vires* the powers granted to it in its compact in leasing Pier 3 to Strober. The court also dismisses plaintiff's request for declaratory judgment that the Port Authority is a "federal agency," which must comply with the National Environmental Protection Act or the Coastal Zone Management Act before leasing Pier 3 to Strober. The court declines to exercise jurisdiction over plaintiff's state law claims under the Waterfront Revitalization Act, the Environmental Quality Review Act, or common law nuisance. These are dismissed without prejudice to refile in state court.

*SO ORDERED.*

---

**10.** Although the Port Authority is not itself a "federal agency," federal environmental statutes nevertheless do govern many of its projects. This is because the Port Authority must often obtain project approval from federal agencies, which are themselves subject to federal laws. As Mr. Alpert explained at oral argument, the Port Authority may have to obtain permits from the Coast Guard or the Corps of Engineers before pursuing projects involving federally regulated areas such as interstate navigation or aviation. (Transcript, Oct. 2, 1996, p. 17.) In meeting *their* federal environmental obligations, these agencies will often delegate to the Port Authority the responsibility for preparing necessary impact statements. *Id.* But the "federal agency" is the supervising entity, not the Port Authority. *See, e.g., Public Hearings on Impacts of the Proposed Goethals Bridge Project,* 60 Fed.Reg. 25258 (May 11, 1995) (in connection with hearings to consider the Port Authority application to the Coast Guard for a bridge over the Arthur Kill waterway, the Coast Guard prepared environmental impact statements regarding the project). The Strober lease does not require the approval of any such federal agency.